# Complaint Exhibit 1

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop: S2-25-26
Baltimore, Maryland   21244-1850



**State Demonstrations Group**

June 26, 2023

Stephanie Stephens
State Medicaid Director
Texas Health and Human Services Commission
4900 Lamar Boulevard
MC:H100
P.O. Box 13247
Austin, Texas 78751

Dear Director Stephens:

The Centers for Medicare & Medicaid Services (CMS) is approving a technical correction to the section 1115(a) demonstration entitled, "Texas Healthcare Transformation and Quality Improvement Program (THTQIP)" (Project Number 11-W-00278/6).  Specifically, we are removing STC 38(a)(ii) to clarify the operations of the Uncompensated Care Pool.  Approval of this technical correction does not authorize new federal funding or change the distribution methodology for the Uncompensated Care Pool, but it removes two requirements that are no longer applicable following the most recent demonstration extension approval.  These include the requirements for private providers to have an executed indigent care affiliation agreement on file with the state and for providers to participate in a Regional Health Partnership (RHP).

We look forward to our continued partnership on the THTQIP section 1115(a) demonstration.  If you have any questions, please contact your CMS project officer, Ms. Diona Kristian, at Diona.Kristian@cms.hhs.gov.

Sincerely,

Angela D.
Garner -S

Digitally signed by
Angela D. Garner -S
Date: 2023.06.26
15:01:31 -04'00'

Angela D. Garner
Director
Division of System Reform Demonstrations

cc: Ford Blunt, State Monitoring Lead, Medicaid and CHIP Operations Group

Enclosure

**CENTERS FOR MEDICARE & MEDICAID SERVICES**
**WAIVER LIST**

**NUMBER:**    11-W-00278/6

**TITLE:**    **Texas Healthcare Transformation and Quality Improvement Program**

**AWARDEE: Texas Health and Human Services Commission**

**Title XIX Waivers**

All requirements of the Medicaid program expressed in law, regulation, and policy statement, not expressly waived in this list, shall apply to the Demonstration project beginning January 15, 2021, through September 30, 2030. In addition, these waivers may only be implemented consistent with the approved Special Terms and Conditions (STCs).

Under the authority of section 1115(a)(1) of the Social Security Act (the Act), the following waivers of State plan requirements contained in section 1902 of the Act are granted in order to enable Texas to carry out the Texas Healthcare Transformation and Quality Improvement Program section 1115 Demonstration.

**1.    Statewideness                                Section 1902(a)**

To enable the State to conduct a phased transition of Medicaid beneficiaries from fee-for-service to a managed care delivery system based on geographic service areas.

To the extent necessary, to enable the State to operate the STAR+PLUS program on a less than statewide basis.

**2.    Amount, Duration, and Scope of Services        Section 1902(a)(10)(B)**

To the extent necessary to enable the State to vary the amount, duration, and scope of services offered to individuals, regardless of eligibility category, by providing additional, or cost-effective alternative benefit packages to enrollees in certain managed care arrangements. To the extent necessary to enable the state to provide a greater duration of hospital services for individuals with severe and persistent mental illness.

**3.    Freedom of Choice                            Section 1902(a)(23)(A)**

To the extent necessary, to enable the State to restrict freedom of choice of provider through the use of mandatory enrollment in managed care plans for the receipt of covered services.  No waiver of freedom of choice is authorized for family planning providers.

**4.    Self-Direction of Care for HCBS Members        Section 1902(a)(32)**

---

**Texas Healthcare Transformation and Quality Improvement Program**
**Demonstration Approval Period: January 15, 2021 through September 30, 2030**
**Technical Correction: June 26, 2023**                                **Page 1 of 2**

To permit section 1915(c)-like Home and Community Based Services (hereinafter HCBS) members to self-direct expenditures for HCBS long-term care and supports as specified in paragraph 28(k) of the STCs.

**Texas Healthcare Transformation and Quality Improvement Program**
**Demonstration Approval Period: January 15, 2021 through September 30, 2030**
**Technical Correction: June 26, 2023**                                                     **Page 2 of 2**

Complaint Exhibit 1, Page 3 of 86

CENTERS FOR MEDICARE & MEDICAID SERVICES
EXPENDITURE AUTHORITIES

**NUMBER:**    **11-W-00278/6**
**TITLE:**      **Texas Healthcare Transformation and Quality Improvement Program**
**AWARDEE:  Texas Health and Human Services Commission**

Under the authority of section 1115(a)(2) of the Social Security Act (the Act), expenditures made by the State for the items identified below, which are not otherwise included as expenditures under section 1903 of the Act, shall, for the period of this demonstration extension, January 15, 2021, through September 30, 2030, be regarded as expenditures under the State's Medicaid title XIX State plan.

**EXPENDITURES RELATED TO POPULATIONS COVERED UNDER THE DEMONSTRATION**

1.    **Expenditures for the STAR+PLUS 217-Like HCBS Group**

Expenditures for the provision of state plan benefits and HCBS like services to individuals age 65 and older, or age 21 and older with disabilities, not eligible for these benefits under the state plan, who would otherwise be Medicaid-eligible under section 1902(a)(10)(A)(ii)(VI) of the Act and 42 CFR § 435.217 in conjunction with section 1902(a)(10)(A)(ii)(V) of the Act, if the services they receive under STAR+PLUS were provided under a HCBS waiver granted to the State under section 1915(c) of the Act. This expenditure authority is subject to an enrollment cap. All Medicaid laws, regulations and policies apply to this expenditure authority except as expressly waived or listed as not applicable.

2.    **Expenditures Related to Managed Care Organization (MCO) Enrollment and Disenrollment**

Expenditures made under contracts that do not meet the requirements in section 1903(m) of the Act specified below. Texas managed care plans will be required to meet all requirements of section 1903(m) of the Act except the following:
   ● Section 1903(m)(2)(H) of the Act, Federal regulations at 42 CFR 438.1, to the extent that the rules in section 1932(a)(4) are inconsistent with the enrollment and disenrollment rules contained in STC 21(c) of the Demonstration's Special Terms and Conditions (STCs), which permit the State to authorize automatic re-enrollment in the same managed care organization (MCO) if the beneficiary loses eligibility for less than six (6) months.

3.    **Expenditures for Inpatient Hospital Services and Prescription Drugs for STAR, STAR Kids, and STAR+PLUS Enrollees that Exceed State Plan Limits**

**Texas Healthcare Transformation and Quality Improvement Program**
**Demonstration Approval Period: January 15, 2021, 2020 through September 30, 2030**
**Technical Correction: June 26, 2023**                                                         **Page 1 of 4**

Complaint Exhibit 1, Page 4 of 86

Expenditures for all enrollees for inpatient hospital services that would not otherwise be covered under the State plan (as outlined in the STCs), and expenditures for prescription drugs for adults ages 21 and older enrolled in STAR or STAR+PLUS.

## 4. HCBS for SSI-Related State Plan Eligibles

Expenditures for the provision of HCBS waiver-like services as specified in Table 5 and Attachment C of the STCs that are not described in section 1905(a) of the Act, and not otherwise available under the approved State plan, but that could be provided under the authority of section 1915(c) waivers, that are furnished to STAR+PLUS enrollees who are ages 65 and older and ages 21 and older with disabilities, qualifying income and resources, and a nursing facility institutional level of care. All Medicaid laws, regulations and policies apply to the Demonstration Expenditure authority except as expressly waived or listed as not applicable.

## 5. EXPENDITURES RELATED TO THE UNCOMPENSATED CARE POOL

Subject to an overall cap on the Uncompensated Care (UC) Pool, the following expenditure authorities are granted for the period of the Demonstration:

Effective October 1, 2019, expenditures for furnishing medical services described in section 1905(a)(1) et seq. of the Act that are incurred by hospitals and other providers for uncompensated costs of medical services provided to uninsured individuals as charity care, and to the extent that those costs exceed the amounts paid to the hospitals pursuant to section 1923 of the Act.  Such funds may be used by providers to offset the uncompensated costs of treating the uninsured, but this expenditure authority does not make uninsured patients eligible for any benefits under the demonstration.

## 6. EXPENDITURES RELATED TO THE DELIVERY SYSTEM REFORM INCENTIVE PAYMENT (DSRIP) PROGRAM

The following expenditure authorities are granted for the 9th, and 10th years of the Demonstration (FFY 2020 and FFY 2021):

Expenditures for incentive payments from DSRIP pool funds for the Delivery System Reform Incentive Payment Program. This expenditure authority does not make uninsured patients eligible for any benefits under the demonstration.

The following expenditure authorities are granted for the 11th and 12th years of the Demonstration (FFY 2022 and FFY 2023):

Incentive payments for prior periods of performance and administrative activities to close out the DSRIP program.

**Texas Healthcare Transformation and Quality Improvement Program**
**Demonstration Approval Period: January 15, 2021, 2020 through September 30, 2030**
**Technical Correction: June 26, 2023**                                    **Page 2 of 4**

Complaint Exhibit 1, Page 5 of 86

## 7. EXPENDITURES RELATED TO COVID-19 RESPONSE

**Additional inpatient hospital care during COVID-19 Public Health Emergency:**
The following are temporary expenditure authorities that will expire 60 days after the conclusion of the Secretary's Public Health Emergency, and are effective March 1, 2020:

Expenditure authority for inpatient hospital stays related to COVID-19 (i.e. a stay for which the COVID-19 diagnosis is listed anywhere on the claim but is not necessarily the primary diagnosis, excluding presumptive positive cases), in order to extend the 30-day spell of illness limitation in STAR+PLUS for an additional 30 days, allowing an individual to stay up to 60 days in a hospital.

Expenditure authority for inpatient hospital stays related to COVID-19 to extend the 30-day spell of illness limitation described in the state plan for an additional 30 days to allow a Medicaid beneficiary to stay up to 60 days in a hospital.

Expenditure authority to allow Medicaid beneficiaries to exceed the $200,000 inpatient hospital benefit limitation for COVID-19 related stays.

## 8. EXPENDITURES RELATED TO THE PUBLIC HEALTH PROVIDERS CHARITY CARE POOL

Subject to an overall cap on the Public Health Providers Charity Care Pool (PHP-CCP), the following expenditure authorities are granted for the period of the Demonstration, effective October 1, 2021:

Through September 30, 2022, expenditures for furnishing services described in section 1905(a)(1) of the Act that are incurred by publicly-owned and operated Community Centers, Local Mental Health Authorities, or Local Behavioral Health Authorities providing behavioral health services under Chapter 533 or Chapter 534 of the Texas Health & Safety Code and publicly-owned and operated Local Health Departments (LHDs) and Public Health Districts (PHDs) that are established under the Texas Health and Safety Code, Title 2, Subtitle F, Chapter 121, not to exceed qualifying providers' uncompensated costs of furnishing services described in section 1905(a) of the Act to Medicaid eligible or uninsured individuals. Effective October 1, 2022, expenditures for services described in section 1905(a) of the Act that are incurred by publicly-owned and operated Community Centers, Local Mental Health Authorities, or Local Behavioral Health Authorities providing behavioral health services under Chapter 533 or Chapter 534 of the Texas Health & Safety Code and publicly-owned and operated Local Health Departments (LHDs) and Public Health Districts (PHDs) that are established under the Texas Health and Safety Code, Title 2, Subtitle F, Chapter 121, not to exceed qualifying providers' uncompensated costs of furnishing services described in section 1905(a) of the Act to uninsured individuals as charity care.

**Texas Healthcare Transformation and Quality Improvement Program**
**Demonstration Approval Period: January 15, 2021, 2020 through September 30, 2030**
**Technical Correction: June 26, 2023**                                      Page 3 of 4

Complaint Exhibit 1, Page 6 of 86

Such funds may be used by providers to offset the uncompensated costs of treating the uninsured, but this expenditure authority does not make uninsured patients eligible for any benefits under the demonstration.

**Texas Healthcare Transformation and Quality Improvement Program**
**Demonstration Approval Period: January 15, 2021, 2020 through September 30, 2030**
**Technical Correction: June 26, 2023**                                                      **Page 4 of 4**

Complaint Exhibit 1, Page 7 of 86

# CENTERS FOR MEDICARE AND MEDICAID SERVICES SPECIAL TERMS AND CONDITIONS
## (STCs)

NUMBER:              11-W-00278/6

TITLE:               **Texas Healthcare Transformation and Quality Improvement Program**

AWARDEE:             **Texas Health and Human Services Commission**

**DEMONSTRATION EXTENSION PERIOD: January 15, 2021 through September 30, 2030**

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                          Page 1 of 79

Complaint Exhibit 1, Page 8 of 86

# CENTERS FOR MEDICARE & MEDICAID SERVICES SPECIAL TERMS AND CONDITIONS

| | |
|---|---|
| **NUMBER:** | **Title XIX No. 11-W-00278/6** |
| **TITLE:** | **Texas Healthcare Transformation and Quality Improvement Program** |
| **AWARDEE:** | **Texas Health and Human Services Commission** |

# I. PREFACE

The following are the Special Terms and Conditions (STCs) for the Texas Healthcare Transformation and Quality Improvement Program section 1115(a) Medicaid demonstration (hereinafter "demonstration"). The parties to this agreement are the Texas Health and Human Services Commission (HHSC/state) and the Centers for Medicare & Medicaid Services (CMS). The STCs set forth, in detail, the nature, character, and extent of Federal involvement in the Demonstrations, and the state's obligations to CMS during the life of the demonstration. This Demonstration is effective the date of the approval letter through September 30, 2030, unless otherwise specified.

The STCs have been arranged into the following subject areas:

    I. Preface
    II. Program Description and Objectives
    III. General Program Requirements
    IV. Demonstration Delivery Systems
        A. Managed Care Delivery Systems
        B. Assurances Related to the Ongoing Operation of Managed Care
        C. Beneficiaries Served Through the Demonstration
        D. STAR AND STAR+PLUS (non-HCBS) and STAR Kids Enrollment, Benefits and Reporting Requirements
        E. Children's Dental Program
        F. STAR+PLUS HCBS Enrollment, Benefits and Reporting Requirements
    V. Funding Pools Under the Demonstration
    VI. Health IT
    VII. General Financial Requirements
    VIII. Neutrality for the Demonstration
    IX. General Reporting Requirements
    X. Monitoring Calls and Discussion
    XI. Evaluation of the Demonstration

The following attachments have been included to provide supplemental information and guidance for specific STCs. The following attachments are incorporated as part of this agreement.

Attachment A: Schedule of Deliverables

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                        Page 2 of 79

Attachment B: Quarterly and Annual Monitoring Report Template
Attachment C: HCBS Service Definitions
Attachment D: Evaluation Design
Attachment E: Reserved
Attachment F: HCBS Fair Hearing Procedures
Attachment G: HCBS Participant Safeguards
Attachment H: UC Claiming Protocol and Application
Attachment I: Regional Healthcare Partnership (RHP) Planning Protocol
Attachment J: Program and Funding Mechanics Protocol
Attachment K: Administrative Cost Claiming Protocol
Attachment L: Consumer Support System Plan
Attachment M: Historical Demonstration Information
Attachment N: Health IT Strategic Plan
Attachment O: Developing the Evaluation Design
Attachment P: Preparing the Evaluation Report
Attachment Q: DSRIP Sustainability Plan
Attachment R: Measure Bundle Protocol
Attachment S: Reserved
Attachment T: PHP-CCP Payment Protocol
Attachment U: Estimated Without Waiver Per Member Per Month Expenditures and PHP-CCP Amounts
Attachment V: COVID-19 Amendment Evaluation Design (Reserved)
Attachment W: Emergency Preparedness and Response Attachment K (1)
Attachment X: Emergency Preparedness and Response Attachment K (2)

## II. OBJECTIVES

Through this demonstration, the state aims to:

- Expand risk-based managed care to new populations and services;
- Support the development and maintenance of a coordinated care delivery system;
- Improve outcomes while containing cost growth; and
- Transition to quality-based payment systems across managed care and providers.

## III. GENERAL PROGRAM REQUIREMENTS

1) **Compliance with Federal Non-Discrimination Statutes.** The state must comply with all applicable Federal statutes relating to non-discrimination. These include, but are not limited to, the Americans with Disabilities Act of 1990 (ADA), Title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973 (Section 504), the Age Discrimination Act of 1975, and section 1557 of the Patient Protection and Affordable Care Act (Section 1557).

2) **Compliance with Medicaid and Children's Health Insurance Program (CHIP) Law, Regulation, and Policy.** All requirements of the Medicaid program and CHIP expressed in law, regulation, and policy

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                     Page 3 of 79

statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents (of which these terms and conditions are part), apply to the demonstration.

3) **Changes in Medicaid and CHIP Law, Regulation, and Policy.** The state must, within the timeframes specified in federal law, regulation, or written policy, come into compliance with any changes in law, regulation, or policy affecting the Medicaid or CHIP programs that occur during this demonstration approval period, unless the provision being changed is expressly waived or identified as not applicable. In addition, CMS reserves the right to amend the STCs to reflect such changes and/or changes as needed without requiring the state to submit an amendment to the demonstration under STC 7. CMS will notify the state 30 business days in advance of the expected approval date of the amended STCs to allow the state to provide comment. Changes will be considered in force upon issuance of the approval letter by CMS. The state must accept the changes in writing.

4) **Impact on Demonstration of Changes in Federal Law, Regulation, and Policy Statements.**
   a) To the extent that a change in federal law, regulation, or policy requires either a reduction or an increase in federal financial participation (FFP) for expenditures made under this demonstration, the state must adopt, subject to CMS approval, a modified budget neutrality agreement as necessary to comply with such change, as well as a modified allotment neutrality worksheet as necessary to comply with such change. The trend rates for the budget neutrality agreement are not subject to change under this subparagraph. Further, the state may seek an amendment to the demonstration (as per STC 7 of this section) as a result of the change in FFP.
   b) If mandated changes in the federal law require state legislation, unless otherwise prescribed by the terms of the federal law, the changes must take effect on the earlier of the day such state legislation becomes effective, or on the last day such legislation was required to be in effect under the law, whichever is sooner.

5) **State Plan Amendments.** The state will not be required to submit title XIX or XXI state plan amendments (SPAs) for changes affecting any populations made eligible solely through the demonstration. If a population eligible through the Medicaid or CHIP state plan is affected by a change to the demonstration, a conforming amendment to the appropriate state plan is required, except as otherwise noted in these STCs. In all such cases, the Medicaid and CHIP state plans govern.

6) **Changes Subject to the Amendment Process.** Changes related to eligibility, enrollment, benefits, beneficiary rights, delivery systems, cost sharing, sources of non-federal share of funding, budget neutrality, and other comparable program elements must be submitted to CMS as amendments to the demonstration. All amendment requests are subject to approval at the discretion of the Secretary in accordance with section 1115 of the Act. The state must not implement changes to these elements without prior approval by CMS either through an approved amendment to the Medicaid or CHIP state plan or amendment to the demonstration. Amendments to the demonstration are not retroactive and no FFP of any kind, including for administrative or medical assistance expenditures, will be available under changes to the demonstration that have not been approved through the amendment process set forth in STC 7 below, except as provided in STC 3.

7) **Amendment Process.**  Requests to amend the demonstration must be submitted to CMS for approval no later than 120 days prior to the planned date of implementation of the change and may not be implemented until approved. CMS reserves the right to deny or delay approval of a demonstration amendment based on non-compliance with the STCs, including but not limited to failure by the state to submit required elements of a complete amendment request as described in this STCs, reports or other deliverables required in the approved STCs in a timely fashion according to the deadlines specified herein. Amendment requests must include, but are not limited to, the following:

   a) An explanation of the public process used by the state, consistent with the requirements of STC 12.  Such explanation must include a summary of any public feedback received and identification of how this feedback was addressed by the state in the final amendment request submitted to CMS;

   b) A detailed description of the amendment, including impact on beneficiaries, with sufficient supporting documentation;

   c) A data analysis which identifies the specific "with waiver" impact of the proposed amendment on the current budget neutrality agreement.  Such analysis must include current total computable "with waiver" and "without waiver" status on both a summary and detailed level through the current approval period using the most recent actual expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as a result of the proposed amendment, which isolates (by Eligibility Group) the impact of the amendment;

   d) An up-to-date CHIP allotment worksheet, if necessary;

   e) The state must provide updates to existing demonstration reporting and quality and evaluation plans.  This includes a description of how the Evaluation Design and annual progress reports will be modified to incorporate the amendment provisions, as well as the oversight, monitoring and measurement of the provisions.

8) **Extension of the Demonstration.**  States that intend to request an extension of the demonstration must submit an application to CMS from the Governor of the state in accordance with the requirements of 42 Code of Federal Regulations (CFR) 431.412(c).  States that do not intend to request an extension of the demonstration beyond the period authorized in these STCs must submit a phase-out plan consistent with the requirements of STC 9.

9) **Demonstration Transition and Phase-Out.**  The state may only suspend or terminate this demonstration in whole, or in part, consistent with the following requirements;

   a) Notification of Suspension or Termination.  The state must promptly notify CMS in writing of the reason(s) for the suspension or termination, together with the effective date and a transition and phase-out plan.  The state must submit a notification letter and a draft transition and phase-out plan to CMS no less than six months before the effective date of the demonstration's suspension or termination.  Prior to submitting the draft transition and phase-out plan to CMS, the state must publish on its website the draft transition and phase-out plan for a 30-day public comment period.  In addition, the state must conduct tribal consultation in accordance with STC 12, if applicable.  Once the 30-day public comment period has ended, the state must provide a summary of the issues raised by the public during the comment period and how the state considered the comments received when developing the revised transition and phase-out plan.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                                      Page 5 of 79

b)   Transition and Phase-out Plan Requirements.  The state must include, at a minimum, in its phase-out plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by which the state will redetermine Medicaid or CHIP eligibility prior to the termination of the demonstration for the affected beneficiaries, and ensure ongoing coverage for eligible beneficiaries, as well as any community outreach activities the state will undertake to notify affected beneficiaries, including community resources that are available.

c)   Transition and Phase-out Plan Approval.  The state must obtain CMS approval of the transition and phase-out plan prior to the implementation of transition and phase-out activities.  Implementation of transition and phase-out activities must be no sooner than 14 calendar days after CMS approval of the transition and phase-out plan.

d)   Transition and Phase-out Procedures.  The state must comply with all applicable notice requirements found in 42 CFR, part 431 subpart E, including sections 431.206- 431.214.  In addition, the state must assure all applicable appeal and hearing rights are afforded to beneficiaries in the demonstration as outlined in 42 CFR, part 431 subpart E, including sections 431.220 and 431.221.  If a beneficiary in the demonstration requests a hearing before the date of action, the state must maintain benefits as required in 42 CFR §431.230.  In addition, the state must redetermine eligibility for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category prior to termination, as required under 42 CFR 435.916(f)(1).  For individuals determined ineligible for Medicaid or CHIP, the state must determine potential eligibility for other insurance affordability programs and comply with the procedures set forth in 42 CFR 435.1200(e) and 457.350.

e)   Exemption from Public Notice Procedures 42 CFR Section 431.416(g).  CMS may expedite the federal and state public notice requirements under circumstances described in 42 CFR 431.416(g).

f)   Enrollment Limitation during Demonstration Phase-Out.  If the state elects to suspend, terminate, or not extend this demonstration, during the last six months of the demonstration, enrollment of new individuals into the demonstration must be suspended.  The limitation of enrollment into the demonstration does not impact the state's obligation to determine Medicaid eligibility in accordance with the approved Medicaid state plan.

g)   Federal Financial Participation (FFP).  If the project is terminated or any relevant waivers are suspended by the state, FFP must be limited to normal closeout costs associated with the termination or expiration of the demonstration including services, continued benefits as a result of beneficiaries' appeals, and administrative costs of disenrolling beneficiaries.

10) **Withdrawal of Waiver or Expenditure Authority.**  CMS reserves the right to withdraw waivers and/or expenditure authorities at any time it determines that continuing the waiver or expenditure authorities would no longer be in the public interest or promote the objectives of title XIX and title XXI.  CMS will promptly notify the state in writing of the determination and the reasons for the withdrawal, together with the effective date, and afford the state an opportunity to request a hearing to challenge CMS' determination prior to the effective date.  If a waiver or expenditure authority is withdrawn, FFP is limited to normal closeout costs associated with terminating the waiver or expenditure authority, including services, continued benefits as a result of beneficiary appeals, and administrative costs of disenrolling beneficiaries.

11) **Adequacy of Infrastructure.**  The state will ensure the availability of adequate resources for implementation and monitoring of the demonstration, including education, outreach, and enrollment; maintaining eligibility

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030

systems; compliance with cost sharing requirements; and reporting on financial and other demonstration components.

12) **Public Notice, Tribal Consultation, and Consultation with Interested Parties.** The state must comply with the state notice procedures as required in 42 CFR section 431.408 prior to submitting an application to extend the demonstration. For applications to amend the demonstration, the state must comply with the state notice procedures set forth in 59 Fed. Reg. 49249 (September 27, 1994) prior to submitting such request. The state must also comply with the Public Notice Procedures set forth in 42 CFR 447.205 for changes in statewide methods and standards for setting payment rates.

The state must also comply with tribal and Indian Health Program/Urban Indian Organization consultation requirements at section 1902(a)(73) of the Act, 42 CFR 431.408(b), State Medicaid Director Letter #01-024, or as contained in the state's approved Medicaid State Plan, when any program changes to the demonstration, either through amendment as set out in STC 7 or extension, are proposed by the state.

13) **Federal Financial Participation (FFP).** No federal matching funds for expenditures for this demonstration, including for administrative and medical assistance expenditures, will be available until the effective date identified in the demonstration approval letter, or if later, as expressly stated within these STCs.

14) **Administrative Authority.** When there are multiple entities involved in the administration of the demonstration, the Single State Medicaid Agency must maintain authority, accountability, and oversight of the program. The State Medicaid Agency must exercise oversight of all delegated functions to operating agencies, MCOs, and any other contracted entities. The Single State Medicaid Agency is responsible for the content and oversight of the quality strategies for the demonstration.

15) **Common Rule Exemption.** The state must ensure that the only involvement of human subjects in research activities that may be authorized and/or required by this demonstration is for projects which are conducted by or subject to the approval of CMS, and that are designed to study, evaluate, or otherwise examine the Medicaid or CHIP program – including public benefit or service programs, procedures for obtaining Medicaid or CHIP benefits or services, possible changes in or alternatives to Medicaid or CHIP programs and procedures, or possible changes in methods or levels of payment for Medicaid benefits or services. CMS has determined that this demonstration as represented in these approved STCs meets the requirements for exemption from the human subject research provisions of the Common Rule set forth in 45 CFR 46.104(b)(5).

# IV. DEMONSTRATION DELIVERY SYSTEMS

This section governs the state's exercise of the following: waivers of the requirements for Statewideness (section 1902(a)(1)), Amount, Duration, and Scope of Services (section 1902(a)(10)(B)), Freedom of Choice (section 1902(a)(23)(A)), and Self-Direction of Care for HCBS Participants (section 1902(a)(32)), and Expenditure Authorities 1 through 4, as well as waivers of the requirements of the federal regulations implementing these statutory provisions.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 7 of 79

Complaint Exhibit 1, Page 14 of 86

## A. MANAGED CARE DELIVERY SYSTEMS

16) **Description of Managed Care Program.** Under terms of this demonstration, the state provides managed medical assistance through the following programs.

   a) **STAR.** STAR is the primary managed care program providing acute care services to low-income families, children, and pregnant women.

   b) **STAR+PLUS.** STAR+PLUS provides acute and long-term service and supports to older adults and adults with disabilities.

   c) **STAR Kids.** The STAR Kids Program provides acute and long-term service and supports to children with disabilities.

   d) **Delivery of Medically Dependent Children Program (MDCP) Services.** The State will deliver services authorized under the MDCP section 1915(c) waiver through the STAR Kids managed care model for those individuals not in state conservatorship. Those children in state conservatorship who are eligible for the MDCP section 1915(c) waiver will receive those services through the STAR Health managed care program under the 1915(a) authority, rather than under the 1115 authority, and through contract with the STAR Health managed care organization.

The state contracts with managed care organizations on a geographical basis, and for this purpose, the state is divided in to service areas. Table 1 provides the definitions of the service areas.

**Table 1. Service Areas and Delivery Systems**

| Service Area | STAR, STAR+PLUS, and STAR Kids |
|---|---|
| **Bexar** | Atascosa, Bandera, Bexar, Comal, Guadalupe, Kendall, Medina, Wilson |
| **Dallas** | Collin, Dallas, Ellis, Hunt, Kaufman, Navarro, Rockwall |
| **El Paso** | El Paso, Hudspeth |
| **Harris** | Austin, Brazoria, Fort Bend, Galveston, Harris, Matagorda, Montgomery, Waller, Wharton |
| **Hidalgo** | Cameron, Duval, Hidalgo, Jim Hogg, Maverick, McMullen, Starr, Webb, Willacy, Zapata |
| **Jefferson** | Chambers, Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk, San Jacinto, Tyler, Walker |
| **Lubbock** | Carson, Crosby, Deaf Smith, Floyd, Garza, Hale, Hockley, Hutchinson, Lamb, Lubbock, Lynn, Potter, Randall, Swisher, Terry |
| **Nueces** | Aransas, Bee, Brooks, Calhoun, Goliad, Jim Wells, Karnes, Kenedy, Kleberg, Live Oak, Nueces, Refugio, San Patricio, Victoria |
| **Tarrant** | Denton, Hood, Johnson, Parker, Tarrant, Wise |
| **Travis** | Bastrop, Burnet, Caldwell, Fayette, Hays, Lee, Travis, Williamson |

| Service Area | STAR, STAR+PLUS, and STAR Kids |
|---|---|
| **Medicaid Rural Service Area: West Texas** | Andrews, Archer, Armstrong, Bailey, Baylor, Borden, Brewster, Briscoe, Brown, Callahan, Castro, Childress, Clay, Cochran, Coke, Coleman, Collingsworth, Concho, Cottle, Crane, Crockett, Culberson, Dallam, Dawson, Dickens, Dimmit, Donley, Eastland, Ector, Edwards, Fisher, Foard, Frio, Gaines, Glasscock, Gray, Hall, Hansford, Hardeman, Hartley, Haskell, Hemphill, Howard, Irion, Jack, Jeff Davis, Jones, Kent, Kerr, Kimble, King, Kinney, Knox, La Salle, Lipscomb, Loving, Martin, Mason, McCulloch, Menard, Midland, Mitchell, Moore, Motley, Nolan, Ochiltree, Oldham, Palo Pinto, Parmer, Pecos, Presidio, Reagan, Real, Reeves, Roberts, Runnels, Schleicher, Scurry, Shackelford, Sherman, Stephens, Sterling, Stonewall, Sutton, Taylor, Terrell, Throckmorton, Tom Green, Upton, Uvalde, Val Verde, Ward, Wheeler, Wichita, Wilbarger, Winkler, Yoakum, Young, and Zavala |
| **Medicaid Rural Service Area: Central Texas** | Bell, Blanco, Bosque, Brazos, Burleson, Colorado, Comanche, Coryell, DeWitt, Erath, Falls, Freestone, Gillespie, Gonzales, Grimes, Hamilton, Hill, Jackson, Lampasas, Lavaca, Leon, Limestone, Llano, Madison, McLennan, Milam, Mills, Robertson, San Saba, Somervell, Washington |
| **Medicaid Rural Service Area: Northeast Texas** | Anderson, Angelina, Bowie, Camp, Cass, Cherokee, Cooke, Delta, Fannin, Franklin, Grayson, Gregg, Harrison, Henderson, Hopkins, Houston, Lamar, Marion, Montague, Morris, Nacogdoches, Panola, Rains, Red River, Rusk, Sabine, San Augustine, Shelby, Smith, Titus, Trinity, Upshur, Van Zandt, Wood |

## B. ASSURANCES RELATED TO THE ONGOING OPERATION OF MANAGED CARE

**17) Managed Care Requirements**

a) <u>General.</u> The state must comply with the managed care regulations published at 42 CFR 438.

b) <u>Medical Care Advisory Committee.</u> The state will maintain a state Medical Care Advisory Committee, per CFR §431.12, which is comprised of Medicaid recipients, Managed Care Organizations, providers, community-based organizations and advocates serving or representing Medicaid recipients and other interested parties as set forth in Tex. Gov't Code sec. 533.041. The advisory committee will provide input and recommendations to the Health and Human Services Commission regarding the statewide implementation of Medicaid Managed Care, including input and recommendations regarding: 1) program design and benefits, 2) systematic concerns from consumers and providers, 3) the efficiency and quality of services delivered by Medicaid managed care organizations, 4) contract requirements for the Medicaid managed care organizations, 5) Medicaid managed care network adequacy, and 6) trends in claims processing. The advisory committee will also assist HHSC with issues relevant to Medicaid managed care to improve the polices established for and programs operating under Medicaid managed care, including early and periodic screening, diagnosis and treatment, provider and patient education issues, and patient eligibility issues. The state will maintain minutes from these meetings and use them in monitoring program operations and identifying necessary program changes. Copies of committee meeting minutes will be made available to CMS upon request and the outcomes of the meetings may be discussed on the demonstration monitoring calls.

c) <u>MCO Participant Advisory Committees.</u> The state shall require each MCO, through its contracts, to create and maintain participant advisory committees through which the MCO can share information and capture enrollee feedback. The MCOs will be required to support and facilitate participant involvement and submit meeting minutes to the State. Copies of meeting minutes will be made available to CMS upon request.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                    Page 9 of 79

Complaint Exhibit 1, Page 16 of 86

d) <u>Independent Consumer Supports.</u> To support the beneficiary's experience receiving medical assistance and long term services and supports in a managed care environment, the State shall create and maintain a system of consumer supports independent from the managed care plans to assist enrollees in understanding the coverage model and in the resolution of problems regarding services, coverage, access and rights.

e) <u>Core Elements of the Independent Consumer Support System.</u>

f) <u>Organizational Structure.</u> The Independent Consumer Supports System shall operate independently from any STAR+PLUS or STAR Kids MCO. The organizational structure of the support system shall facilitate transparent and collaborative operation with beneficiaries, MCOs, and state government.

g) <u>Accessibility.</u> The services of the Independent Consumer Supports System will be available to all Medicaid beneficiaries enrolled in STAR+PLUS or STAR Kids receiving Medicaid long-term services and supports (institutional, residential and community based). The Independent Consumer Supports system will be accessible through multiple entryways (e.g., phone, internet, office) and will have the capacity to reach out to beneficiaries and/or authorized representatives through various means (mail, phone, in person), as appropriate.

h) <u>Functions.</u> The Independent Consumer Supports system will be available to assist beneficiaries in navigating and accessing covered health care services and supports. Where an individual is enrolling in a new delivery system, the services of this system help individuals understand their choices and resolve problems and concerns that may arise between the individual and a provider/payer. The following list encompasses the system's scope of activity.

i) The system will offer beneficiaries support in the pre-enrollment stage, such as unbiased health plan choice counseling and general program- related information.

j) The system will serve as an access point for complaints and concerns about health plan enrollment, access to services, and other related matters.

k) The system will be available to help enrollees understand the hearing, grievance, and appeal rights and processes within the health plan as well as the fair hearing, grievance, and appeal rights and processes available at the state level and assist them through the process if needed/requested.

l) <u>Staffing and training.</u> The Independent Consumer Supports system will include individuals who are knowledgeable about the state's Medicaid programs; beneficiary protections and rights under Medicaid managed care arrangements; and the health and service needs of persons with complex needs, including those with a chronic condition, disability, and cognitive or behavioral needs. In addition, the Independent Consumer Supports System will ensure that its services are delivered in a culturally competent manner and are accessible to individuals with limited English proficiency. The system ultimately developed by the state may draw upon existing staff within the chosen organizational structure and provide substantive training to ensure core competencies and a consistent consumer experience.

m) <u>Data Collection and Reporting.</u> The Independent Consumer Supports System shall track the volume and nature of beneficiary complaints and the resolution of such complaints on a schedule and manner determined by the state, but no less frequently than quarterly. This information will inform the state of any provider or contractor issues and support the reporting requirements to CMS.

n) <u>Reporting under the Demonstration.</u> The state will report on the activities of the Independent Consumer Support System in the annual monitoring reports. The approved Independent Consumer Support System Plan is shown in Attachment L. Changes to Attachment L must be submitted to CMS for review and

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 10 of 79

Complaint Exhibit 1, Page 17 of 86

approval subject to STC 7. The state will monitor the impact of the Independent Consumer Support Program in the demonstration.

## C. BENEFICIARIES SERVED THROUGH THE DEMONSTRATION

18) **Eligibility Groups Affected by the Demonstration.** Mandatory and optional Medicaid state plan groups described below are subject to all applicable Medicaid laws and regulations except as expressly waived under authority granted by this Demonstration and as described in these STCs. Any Medicaid state plan amendments to the eligibility standards and methodologies for these eligibility groups will apply to this demonstration. These state plan eligible beneficiaries are required under the demonstration to enroll in managed care to receive benefits and may have access to additional benefits not described in the state plan. Table 2 below describes the state plan eligibility groups that are mandatory and voluntary enrollees into managed care. A STAR+PLUS member who enters a nursing facility remains in STAR+PLUS and the nursing facility services are paid through managed care.

Complaint Exhibit 1, Page 18 of 86

**Table 2. State Plan Populations Affected by the Demonstration**

A=STAR Start of Demo; **B** = STAR+PLUS Start of Demo; **C** = STAR March 2012; **D** = STAR March 2012 (MRSA); **E** = STAR+PLUS March 2012; **F**= STAR January 2014; **G** = STAR+PLUS September 2014; **\*** = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G"); **H** = STAR Kids November 1, 2016, includes only individuals from birth through age 20; **I** = STAR+PLUS September 2017; **J**=STAR Kids September 2017; **K**= STAR September 2017.

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T)PLUS | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| **Low Income Families** §1931 low income families | Parents and other caretaker relatives; §1902(a)(10)(A)(i)(I); 42 CFR §435.110 MEG: THTQIP-Adults (parents and caretaker relatives) | 14% FPL (uses MAGI converted AFDC limits); No resource test; member meets relationship requirement | A, C, D | | | | | |
| **Earnings Transitional Twelve months TMA from increase in earnings, combined increase in earnings and Alimony/Spousal support** | Individuals who lose eligibility under §1931 due to increased earnings or hours of work §1902(a)(52); §1902(e)(1); §1925; §1931(c)(2) MEG: THTQIP-Adults (parents and caretaker relatives) OR THTQIP-Children (dependent children) | 185% FPL in second extension period; No resource test | A, C, D | | | | | |
| **Alimony/ Spousal Support Transitional Four months post Medicaid resulting from Alimony/ Spousal support** | Individuals who lose eligibility under §1931 due to Alimony/ Spousal support; §1902(a)(10)(A)(i)(I); ); 42 CFR §435.115 MEG: THTQIP-Adults (parents and caretaker relatives) OR THTQIP-Children (dependent children) | N/A; No resource test | A, C D | | | | | |
| **Pregnant Women** | §1902(a)(10)(A)(i)(IV), §1902(l)(1)(A); 42 CFR §435.116 MEG: THTQIP-Adults | 198% FPL; No resource test | A, C, D | | | | | |
| **Children Under 1** | Poverty level infants; §1902(a)(10)(A)(i)(IV), §1902(l)(1)(B); 42 CFR §435.118 MEG: THTQIP-Children | 198% FPL | A, C, D | | | | | |

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T)PLUS | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| **Newborn Children** **Children to age one born to Medicaid eligible mother** | Deemed Newborn – mother was eligible for and received Medicaid for the birth; §1902(e)(4), 42 CFR §435.117 MEG: THTQIP-Children | N/A; No resource test | A, C, D | | | | | |
| **Children Age 1-5** | Poverty level children under 6; §1902(a)(10)(A)(i)(VI), §1902(l)(1)(C); 42 CFR §435.118 MEG: THTQIP-Children | 144% FPL | A, C, D | | | | | |

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T)PLUS | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| **Children Age 6-18** | Poverty level children under 19; §1902(a)(10)(A)(i)(VII), §1902(l)(1)(D); 42 CFR §435.118 Note: All children at or below 100 percent FPL in this eligibility group are funded through title XIX. Title XXI funding for children between 100-133% FPL shall be claimed as outlined in 42 CFR § 433.11<br>MEG:  If title XIX: THTQIP-Children<br>If title XXI: THTQIP-MCHIP Children | 133% FPL | A, C, D, F | | | | | |
| **Former Foster Care Children** | Former foster care children §1902(a)(10)(A)(i)(IX); 42 CFR §435.150 Mandatory managed care for 18- 26. Ages 18 through 20: Choice between STAR Health or STAR. If receiving 1915(c) services: choice between STAR Health or STAR Kids. Ages 21 through 26: STAR-If receiving 1915(c) IDD waiver services (unless the individual is dually eligible): STAR+PLUS<br>MEG: THTQIP-Children (if under age 21) OR THTQIP-Adults (parents and caretaker relatives, if age 21 or older) | N/A; No resource test | F | | I | | J | |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 14 of 79

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T)PLUS | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| **SSI Recipient 21 and older with Medicare (Dual)** | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(ll) §1902(a)(10)(A)(i)(ll)(cc) Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B, E, G | | | |
| **SSI Recipient under 21 with Medicare (Dual)** | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(ll) §1902(a)(10)(A)(i)(ll)(cc). Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B, E, G | H | |
| **SSI Recipient without Medicare 21 and older** | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i) (II) §1902(a)(10)(A)(i) (II)(cc). Covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B, E, G | | | |
| **SSI Recipient without Medicare under 21** | Individuals receiving SSI cash benefits; §1902(a)(10)(A)(i)(II) §1902(a)(10)(A)(i)(II)(cc) covers gap month children within the waiver; however, retroactive payments, including payment for the gap month, are paid via FFS MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B, E, G | H | |
| **Pickle Group 21 and older, with Medicare Includes pre-Pickle eligibility group** | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §§435.134, 435.135 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B, E, G | | | |

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T)PLUS | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| **Pickle Group 21 and older without Medicare** Includes pre-Pickle eligibility group | Would be eligible for SSI if title II COLAs were deducted from income; 42 CFR §435.134, 42 CFR §435.135 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B, E, G | | | |
| **Pickle Group under 21 with Medicare** | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §435.135 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B, E, G | H | |
| **Pickle Group under 21 without Medicare** | Would be eligible for SSI if title II COLAs deducted from income; 42 CFR §435.135 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B, E, G | H | |
| **Disabled Adult Children (DAC) 21 or over with Medicare** | §1635(c); §1935 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | B, E, G | | | |
| **Disabled Adult Children (DAC) 21 or over without Medicare** | §1635(c); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B, E, G | | | |
| **DAC under 21 with Medicare** | §1635(c); §1935 MEG: THTQIP-AMR | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | | | B, E, G | H | |
| **DAC under 21 without Medicare** | 1635(c); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | | A* D* | | B, E, G | H | |
| **Disabled Widow(er)** | Widows/Widowers, 1634(b); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B, E, G | | | |

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T)PLUS | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| **Early Aged Widow(er)** | Early Widows/ Widowers, 1634(d); §1935 MEG: THTQIP-Disabled | 74% FPL (SSI Limit); $2,000 individual, $3,000 couple | D* | A* | B, E, G | | | |
| **Medicaid Buy-In (MBI) with Medicare** | BBA Work Incentives Group; §1902(a)(10)(ii)(XIII) MEG: THTQIP-AMR | 250% FPL; $2,000 | | | B, E, G | | H | |
| **Medicaid Buy-In (MBI) without Medicare** | BBA Work Incentives Group; §1902(a)(10)(ii)(XIII) MEG: THTQIP-Disabled | 250% FPL; $2,000 | D* | A* | | B, E, G | H | |
| **Medicaid Buy-In for Children (under age 19) with Medicare** | Family Opportunity Act (MBIC), §1902(a)(10)(A)(ii)(XIX) MEG: THTQIP-AMR | 300% FPL; No resource standard | | | | B, E, G | H | |
| **Medicaid Buy-In for Children (under age 19) without Medicare** | Family Opportunity Act (MBIC), §1902(a)(10)(A)(ii)(XIX) MEG: THTQIP-Disabled | 300% FPL; No resource standard | | A* D* | | B, E, G | H | |
| **Nursing Facility age 21 and older** | Special income level group, in a medical institution for at least 30 consecutive days with gross income that does not exceed 300% of the SSI income standard; §1902(a)(10)(A)(ii) (V) MEG: THTQIP-AMR (with Medicare) OR THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/ $3,000 couple | | | B†, E†, G | | | |
| **217 Group without Medicare under 21** | Institutional eligibility and post- eligibility rules for individuals who are eligible as specified under 42 CFR 435.217, 435.236, and 435.726 and §1924 of the Act. MEG: THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. Use spousal impoverishment policy for eligibility, and for post-eligibility. | | D* | | G | H | |

Complaint Exhibit 1, Page 24 of 86

| Medicaid Eligibility Group | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+ (T)PLUS | | STAR Kids (S) | |
|---|---|---|---|---|---|---|---|---|
| | | | Mandatory | Voluntary | Mandatory | Voluntary | Mandatory | Voluntary |
| **217 Group without Medicare 21and older** | Institutional eligibility and post- eligibility rules for individuals who are eligible as specified under 42 CFR 435.217, 435.236, and 435.726 and §1924 of the Act. MEG: THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. Use spousal impoverishment policy for eligibility, and for post-eligibility. | D* | | G | | | |
| **Medicaid for Breast and Cervical Cancer (MBCC)** | Individuals screened for breast and cervical cancer by the Centers for Disease Control and Prevention breast and cervical cancer early detection program and found to need treatment for breast or cervical cancer as specified in §1902 (aa) and 42 CFR 435.213. MEG: THTQIP-AMR | N/A; No resource test. | | | I | | | |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                        Page 18 of 79

| Adoption Assistance and Permanency Care Assistance (AAPCA) | Children and young adults who are the subject of a IV-E adoption assistance agreement, as specified in SSA §1902(a)(10)(A)(i)(I), SSA §473(b)(3), and 42 CFR §435.145.<br><br>Children and young adults who are the subject of a non-IV-E adoption assistance agreement, as specified in SSA §1902(a)(10)(A)(ii)(VII) and 42 CFR §435.227.<br><br>Children and young adults for whom IV-E guardianship assistance payments are made, as specified in SSA §1902(a)(10)(A)(i)(I), SSA §473(b)(3), and 42 CFR §435.145.<br><br>Children and young adults in AAPCA who meet any of the following criteria will have a choice between STAR Health and STAR Kids:<br><br>receiving Supplemental Security Income (SSI),were receiving SSI before becoming eligible for AAPCA enrolled in Medicare enrolled in a 1915(c) Medicaid waiver<br><br>Children and young adults in AAPCA who meet all of the following criteria are mandatory for STAR: not receiving SSI, not receiving SSI before becoming eligible for AAPCA not enrolled in Medicare not enrolled in a 1915(c) waiver Note: AAPCA clients who reside out-of-state will remain FFS.<br>MEG: THTQIP Children (if under age 21) OR THTQIP-Adult (if age 21 or older) | N/A; No resource test. | K |  |  |  |  | J |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023

Page 19 of 79

**(S):** Note children and young adults who are members of federally-recognized tribes will still be able to opt to remain in traditional fee-for-service Medicaid.**(T):** Note individuals who are members of federally-recognized tribes, and have Medicaid through the Medicaid for Breast and Cervical Cancer Program, Adoption Assistance Program, Permanency Care Assistance Program or Former Foster Care Group will be able to voluntarily enroll in managed care or opt to remain in traditional fee-for-service Medicaid.

19) **Demonstration Expansion Population – STAR+PLUS 217-Like Eligibility Group.** Table 3 below describes the demonstration expansion populations that are mandatory and voluntary enrollees into managed care. Groups made eligible by virtue of the expenditure authorities expressly granted in this demonstration are subject to Medicaid laws, regulations and policies, except as expressly identified as not applicable under expenditure authority granted in this demonstration.

**Table 3. Demonstration Expansion Populations Made Eligible by the Demonstration**

| A=STAR Start of Demo; B = STAR+PLUS Start of Demo; C = STAR March 2012; D = STAR March 2012 (MRSA); E = STAR+PLUS March 2012; F = STAR January 2014; G = STAR+PLUS September 2014; \* = Effective through August 31, 2014 (part of STAR+PLUS effective September 1, 2014 – see "G") | | | | | | |
|---|---|---|---|---|---|---|
| **Medicaid Eligibility Group** | Description and Medicaid Eligibility Group (MEG) | Income Limit and Resource Standards | STAR | | STAR+PLUS | |
| | | | Mandatory | Voluntary | Mandatory | Voluntary |
| **217-Like Group Categorically needy individuals under the State plan receiving HCBS services (of the kind listed in Table 6) in the STAR+PLUS service areas.** | Institutional eligibility and post-eligibility rules for individuals who would only be eligible in the same manner as specified under 42 CFR 435.217, 435.236, 435.726, and §1924 of the Act, if the State had not eliminated its 1915(c) STAR+PLUS and CBA waivers. MEG: THTQIP-AMR (with Medicare) OR THTQIP-Disabled (without Medicare) | 300% SSI or Approx. 220% FPL; $2,000 individual/$3,000 couple. Use spousal impoverishment policy for eligibility and for post-eligibility | | | B | |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                    Page 20 of 79

20) **Populations Not Affected by the Demonstration.** The following populations receive Medicaid services without regard to the demonstration.
   a)  Medically Needy;
   b) STAR Health enrollees, transitioning foster care youth, independent foster care adolescents, and optional categorically needy children eligible under 42 CFR 435.222;
   c) Adults 21 or older who have Medicare Part A or B and who are receiving 1915(c) IDD waiver services (HCS, TxHmL, CLASS and DBMD);
   d) Residents of State Supported Living Centers;
   e) Undocumented or Ineligible (5-year bar) Aliens only eligible for emergency medical services;
   f) Individuals residing in a nursing facility who entered the nursing facility while enrolled in STAR, beginning with the month after the State receives notification that they entered the nursing facility;
   g) Individuals enrolled in the Program for All Inclusive Care for the Elderly (PACE) program; and
   h) Individuals residing in a facility in the pediatric care facility class of nursing facilities (currently, the Truman W. Smith Children Care Center), or any Veterans Land Board (VLB) Texas State Veterans Homes.

## D. STAR, STAR+PLUS (non-HCBS), and STAR Kids ENROLLMENT, BENEFITS AND REPORTING REQUIREMENTS

21) **Enrollment.**
   a) **Time to Choose a Plan.** All beneficiaries who obtain Medicaid eligibility will have at least 15 days to choose a managed care organization.
   b) **Auto-Assignment.** If a potential beneficiary does not choose a managed care organization within the time frames defined in (a), he or she may be auto-assigned to a managed care organization. When possible, the auto-assignment algorithm shall take into consideration the beneficiary's history with a primary care provider, and when applicable, the beneficiary's history with a managed care organization. If this is not possible the state will equitably distribute beneficiaries among qualified MCOs.
   c) **Re-Enrollment.** The State may automatically re-enroll a beneficiary in the same managed care organization if there is a loss of Medicaid eligibility for six months or less.

22) **Disenrollment or Transfer.** Individuals should be informed of opportunities no less than annually for disenrollment and ongoing plan choice opportunities, regularly and in a manner consistent with 42 CFR 438 and other requirements set forth in the Demonstration Special Terms and Conditions.
   a) **MCO Transfer at Request of Beneficiary.** Beneficiaries may request transfer to another managed care organization in the service area through the enrollment broker at any time.
   b) **Disenrollment at Request of Beneficiary.** Recipients that are voluntarily enrolled in a managed care programs may request disenrollment and return to traditional Medicaid. Mandatory recipients must request disenrollment from managed care in writing to HHSC; however, HHSC considers disenrollment from managed care only in rare situations, when sufficient medical documentation establishes that the MCO cannot provide the needed services, or in any of the circumstances described in 42 CFR 438.56(c). An authorized HHSC representative reviews all disenrollment requests, and processes approved requests

Complaint Exhibit 1, Page 28 of 86

for disenrollment from an MCO. The Enrollment Broker provides disenrollment education and offers other options as appropriate.

c) **Disenrollment at Request of MCO.** A managed care organization has a limited right to request a beneficiary be disenrolled from the managed care organization without the beneficiary's consent pursuant to 42 CFR 438.56(b).

23) **Benefits.** The following Table 4a specifies the scope of services that may be made available to STAR, STAR+PLUS, and STAR Kids enrollees through the STAR, STAR+PLUS and STAR Kids managed care plans. The schedule of services mirrors those provided in the Medicaid State plan, with the exception of 1915(b)(3)-like services as described in this waiver. The individuals in these programs would still be able to receive all Texas state plan services based on medical necessity that are not listed in this chart and delivered outside of managed care; e.g. dental, ICF/IID. Should the state amend its State plan to provide additional optional services not listed below, coverage for those services may also be provided through the STAR, STAR+PLUS, and STAR Kids MCOs.

## Table 4a. State Plan Services[1] for STAR, STAR+PLUS, and STAR Kids Participants

| Adult/Child | Service | Mandatory or Optional State Plan Services (*) |
|---|---|---|
| Adult/Child | Inpatient Hospital Services 1,2,3 | Mandatory §1905(a)(1), 42 CFR 440.10 |
| Adult/Child | Outpatient Hospital Services | Mandatory §1905(a)(2), 42 CFR 440.20 |
| Adult/Child | Rural Health Clinic Services | Mandatory §1905(a)(2), 42 CFR 440.20 |
| Adult/Child | Federally Qualified Health Center (FQHC) Services | Mandatory §1905(a)(2) |
| Adult/Child | Laboratory and x-ray services | Mandatory §1905(a)(3), 42 CFR 440.30 |
| Adult/Child | Diagnostic Services | Optional §1905(a)(13), 42 CFR 440.130(a) |
| Child | EPSDT | Mandatory §1905(a)(4), 1902(a)(43), 1905(r) |
| Adult/Child | Family Planning | Mandatory §1905(a)(4) |
| Adult/Child | Tobacco cessation counseling services for pregnant women. | Mandatory §1905(a)(4) |
| Adult/Child | Physician's Services | Mandatory §1905(a)(5), 42 CFR 440.50(a) |
| Adult/Child | Medical and Surgical Services Furnished by a Dentist | Mandatory §1905(a)(5), 42 CFR 440.50(b) |

---

[1] Services are provided as detailed in Texas' state plan.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                         Page 22 of 79

Complaint Exhibit 1, Page 29 of 86

| Adult/Child | Service | Mandatory or Optional State Plan Services (*) |
|---|---|---|
| Adult/Child | Podiatrists' Services | Optional §1905(a)(6), 42 CFR 440.60(a) |
| Adult/Child | Optometrists' Services | Optional §1905(a)(6), 42 CFR 440.60(a) |
| Adult/Child | Chiropractor services | Optional §1905(a)(6), 42 CFR 440.60(b) |
| Adult/Child | Other practitioner services: certified registered nurse anesthetists' services, other categories of advanced nurse practitioner services, licensed clinical social worker (LCSW) services, licensed professional counselor (LPC) services, licensed marriage and family therapist (LMFT) services, psychologists services, services provided by physician assistants, and licensed midwife services | Optional §1905(a)(6), 42 CFR 440.60 |
| Adult/Child | Intermittent or part-time nursing services provided by a home health agency | Mandatory §1905(a)(7), 42 CFR 440.70 |
| Adult/Child | Home health aide services provided by a home health agency | Mandatory §1905(a)(7), 42 CFR 440.70 |
| Adult/Child | Medical supplies, equipment, and appliances | Mandatory §1905(a)(7), 42 CFR 440.70 |
| Adult/Child | Physical therapy, occupational therapy, speech pathology, and audiology provided by a home health agency | Optional §1905(a)(7) 42 CFR 440.70 |
| Adult/Child | Clinic Services | Optional §1905(a)(9), 42 CFR 440.90 |
| Child | Private Duty Nursing Services | Optional §1905(a)(8), 42 CFR 440.80 |
| Adult/Child | Prescribed Drugs | Optional §1905(a)(12), §1902(a)(54) |
| Adult/Child | Physical Therapy and related services | Optional §1905(a)(11), 42 CFR 440.110(a) |
| Adult/Child | Speech Therapy services | Optional §1905(a)(11) , 42 CFR 440.110(c) |
| Adult/Child | Non-prescription drugs | Optional §1905(a)(12), §1902(a)(54) |
| Adult/Child | Prosthetic Devices | Optional §1905(a)(12), 42 CFR 440.120(c) |
| Adult/Child | Eyeglasses | Optional §1905(a)(12), 42 CFR 440.120(d) |
| Adult/Child | Preventive Services | Optional §1905(a)(13), 42 CFR 440.130(c) |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023

| Adult/Child | Service | Mandatory or Optional State Plan Services (*) |
|---|---|---|
| Adult | Services for individuals over age 65 in IMDs – Inpatient, Not Nursing Facility | Optional §1905(a)(14), 42 CFR 440.140(a) |
| Adult | Nursing facility services (STAR+PLUS only) | Mandatory §1905(a)(4), 42 CFR 440.155(b) |
| Child | Inpatient psychiatric facility services for individuals under age 21 | Optional §1905(a)(16), 42 CFR 440.160 |
| Adult (STAR+PLUS/STAR Kids) | Rehabilitative Services – Day Activity & Health Services | Optional §1905(a)(13), , 42 CFR 440.130(d) |
| Adult/Child | Mental Health Rehabilitative Services | Optional, Rehabilitation Service, 1905(a)(13) and 42 CFR 440.130(d) |
| Adult/Child | Targeted Case Management for Individuals with Chronic Mental Illness | Optional 1915(a)(19), 1915(g), 42 CFR 440.169(b) |
| Adult/Child | Nurse-Midwife Services | Mandatory §1905(a)(17), 42 CFR 440.165 |
| Adult/Child | Extended services for pregnant women–Pregnancy-related and postpartum services for a 60-day period after the pregnancy ends and any remaining days in the month in which the 60th day falls | Mandatory §1902(e)(5), 42 CFR 440.250(p) |
| Adult/Child | Extended services for pregnant women–Services for any other medical conditions that may complicate pregnancy. | Mandatory §1905(a)(1-5), (17), (21), (28), 42 CFR 440.250(p) |
| Adult/Child | Certified pediatric or family nurse practitioners' services | Mandatory §1905(a)(21), 42 CFR 440.166 |
| Adult/Child | Personal care services in the home | Optional §1905(a)(24) 42 CFR 440.167 |
| Adult/Child | Community First Choice | Optional §1915(k) |
| Adult/Child | Ambulatory prenatal care for pregnant women furnished during a presumptive eligibility period by a eligible provider (in accordance with section 1920 of the Act). | Optional §1920 |
| Adult/Child | Respiratory care services (in accordance with section 1902(e)(9)(A) through (C) of the Act). | Optional §1905(a)(20), 42 CFR 440.185 |

Complaint Exhibit 1, Page 31 of 86

| Adult/Child | Service | Mandatory or Optional State Plan Services (*) |
|---|---|---|
| **Adult/Child** | Services provided in Religious Nonmedical Health Care Institutions. | Optional §1905(a)(31), 42 CFR 440.170(b), 440.170(c) |
| **Adult/Child** | Emergency hospital services. | Optional §1905(a)(31), 42 CFR 440.170(e) |
| **Adult/Child** | Ambulatory Surgical Center Services | Optional §1905(a)(31), 42 CFR 440.90 |
| **Adult/Child** | Birthing Center Facility Services | Optional §1905(a)(28), (31) |
| **Adult/Child** | Transportation | Optional 1905(a)(31), 42 CFR 440.170(a) |

[1]Substance use disorder treatment services are capitated services for STAR, STAR+PLUS, and STAR Kids, and MCOs may provide these services in a chemical dependency treatment facility in lieu of the acute care inpatient hospital setting. Similarly, the MCOs will be responsible for providing acute inpatient days for psychiatric conditions and may provide these services in a free-standing psychiatric hospital in lieu of acute care inpatient hospital settings. The State does not include non-State plan services, such as room and board, in the STAR, STAR+PLUS, and STAR Kids capitation; however, the MCO is not restricted to only the delivery of State plan services when alternative services are a cost-effective and medically appropriate response to the needs of the member.

[2]The 30-day spell of illness limitation for hospital inpatient services described in the state plan does not apply to STAR enrollees, certain approved transplants, children age 20 and younger, or to individuals with severe and persistent mental illness. In addition, for inpatient hospital stays related to COVID-19 (i.e. a stay for which the COVID-19 diagnosis is listed anywhere on the claim but is not necessarily the primary diagnosis, excluding presumptive positive cases), Texas will extend the 30-day spell of illness limitation described in the state plan for an additional 30 days to allow an individual to stay up to 60 days in a hospital for the period of the COVID19 Public Health Emergency (PHE).The state will also allow an individual to exceed the $200,000 inpatient hospital benefit limitation for COVID-19 related stays during the PHE.

[3]The annual monetary benefit limitation on inpatient hospital services that is described in the state plan does not apply to STAR, STAR+PLUS, and STAR Kids enrollees.

(*) This column describes whether a services is a required state plan service or if a state can elect to cover the service under the Social Security Act. All services listed here are covered in the Texas State plan.

+ The state plan prescription drug limitations for adults aged 21 and older do not apply to STAR or STAR+PLUS enrollees.

24) **Self-Referral.** Demonstration beneficiaries may self-refer for the following services:
   a) In-network behavioral health services;
   b) Obstetric and gynecological services, regardless of whether the provider is in the client's MCO network;
   c) In-network eye health care services, other than surgery, including optometry and ophthalmology;
   d) Family planning services, regardless of whether the provider is in the client's MCO network; and
   e) Services from a provider with the Early Childhood Intervention program for children ages 0-3 years with a developmental delay.

25) **Federally Qualified Health Centers and Rural Health Centers.** An enrollee is guaranteed the choice of at least one MCO which has at least one FQHC as a participating provider. If the enrollee elects not to select an MCO that includes a FQHC in the provider network, no FQHC services will be required to be furnished to the enrollee while the enrollee is enrolled with that MCO. The same requirements apply to Rural Health Centers.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023

Complaint Exhibit 1, Page 32 of 86

26) **Early and Periodic Screening, Diagnosis, and Treatment (EPSDT).** The MCOs will fulfill the state's responsibilities for coverage, outreach, and assistance with respect to EPSDT services that are described in the requirements of sections 1905(a)(4)(b) (services), 1902(a)(43) (administrative requirements), and 1905(r) (definitions).

## E. CHILDREN'S DENTAL PROGRAM

27) **Implementation of the Children's Dental Program.** Children's primary and preventive Medicaid dental services are delivered through a capitated statewide dental services program (the Children's Dental Program). Contracting dental maintenance organizations (DMOs) maintain networks of Main Dental Home providers, consisting of general dentists and pediatric dentists. The dental home framework under this statewide program is informed by the improved dental outcomes evidenced under the "First Dental Home Initiative" in the State. Services provided through the Children's Dental Program are separate from the medical services provided by the STAR,STAR+PLUS, and STAR Kids managed care organizations, and are available to persons listed in Table 2 who are under age 21, with the exception of the groups listed in (a) below. The Children's Dental Program must conform to all applicable regulations governing prepaid ambulatory health plans (PAHPs), as specified in 42 C.F.R. 438.

a) The following Medicaid recipients are excluded from the Children's Dental Program, and will continue to receive their Medicaid dental services outside of the Demonstration: Medicaid recipients age 21 and over; all Medicaid recipients, regardless of age, residing in Medicaid-paid facilities such as nursing homes, state supported living centers, or Intermediate Care Facilities for Individuals with an Intellectual Disability or Related Conditions (ICF/ID); and STAR Health Program recipients.

b) The state will collect relevant data from each DMO to comply with CMS-416 reporting requirements.

## F. STAR+PLUS HOME AND COMMUNITY BASED SERVICES (HCBS) ENROLLMENT, BENEFITS AND REPORTING REQUIREMENTS

28) **Operations of the STAR+PLUS HCBS Program**

a) **Compliance with Specified HCBS Requirements.** All federal regulations that govern the provision of HCBS under section 1915(c) waivers apply, to the HCBS program authorized under section 1115, and provided through STAR+PLUS. The state includes a description of the steps taken to ensure compliance with these regulations as part of the Annual Monitoring Report discussed in STC 74. HCBS, under the demonstration, operates in accordance with these STCs and associated attachments. For services that could have been authorized to individuals under a 1915(c) waiver, the state's Quality Assessment and Performance Improvement Plan must encompass LTSS specific measures set forth in the federal managed care rule at 42 CFR 438.330 and should also reflect how the state will assess and improve performance to demonstrate compliance with applicable federal waiver assurances set forth in 42 CFR 441.301 and 441.302 as follows:

(1) **Administrative Authority**: A performance measure should be developed and tracked for any authority that the State Medicaid Agency (SMA) delegates to another agency, unless already captured in another performance measure.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 26 of 79

(2) **Level of Care or Eligibility based on 1115 Requirements**: Performance measures are required for the following: applicants with a reasonable likelihood of needing services receive a level of care determination or an evaluation for HCBS eligibility, and the processes for determining level of care or eligibility for HCBS are followed as documented.  While a performance measure for annual levels of care/eligibility is not required to be reported, the state is expected to be sure that annual levels of care/eligibility are determined.

(3) **Qualified Providers**: The state must have performance measures that track that providers meet licensure/certification standards, that non-certified providers are monitored to assure adherence to demonstration requirements, and that the state verifies that training is given to providers in accordance with the demonstration.

(4) **Service Plan**: The state must demonstrate it has designed and implemented an effective system for reviewing the adequacy of service plans for HCBS participants.  Performance measures are required for choice of waiver services and providers, service plans address all assessed needs and personal goals, and services are delivered in accordance with the service plan including the type, scope, amount, duration, and frequency specified in the service plan.

(5) **Health and Welfare**: The state must demonstrate it has designed and implemented an effective system for assuring HCBS participants health and welfare.  The state must have performance measures that track that on an ongoing basis it identifies, addresses and seeks to prevent instances of abuse, neglect, exploitation and unexplained death; that an incident management system is in place that effectively resolves incidents and prevents further singular incidents to the extent possible; that state policies and procedures for the use or prohibition of restrictive interventions are followed; and, that the state establishes overall health care standards and monitors those standards based on the responsibility of the service provider as stated in the approved demonstration (See Attachment G).

(6) **Financial Accountability**: The state must demonstrate that it has designed and implemented an adequate system for ensuring financial accountability of the HCBS program. The state must demonstrate actuarial soundness on an annual basis pursuant to 42 CFR 438.

b) **Determination of Benefits by Designation into a STAR+PLUS HCBS Group.**  The STAR+PLUS HCBS Program provides long-term services and supports as identified in Table 5 to two groups of people, as defined below:

i) **STAR+PLUS 217-Like HCBS Group.** This group consists of persons age 21 and older, who meet the NF level of care (LOC), who qualify as members of the 217-Like HCBS Group, and who need and are receiving HCBS as an alternative to NF care. The Demonstration population includes persons who could have been eligible under 42 CFR 435.217 had the state continued its section 1915(c) HCBS waiver for persons who are elderly and/or physically disabled. This group is subject to a numeric enrollment limitation, as described below.

(1) **Interest List for STAR+PLUS 217-LIKE HCBS Group.** The state operates an interest list for the STAR+PLUS 217-Like HCBS population in the demonstration who are not in the STAR+PLUS mandatory eligibility categories. An interest list is a list that an individual is placed on when they express interest in enrollment, to the state or local agency that determines eligibility for STAR +PLUS. Individuals meeting all eligibility criteria are enrolled into this population on a "first-come, first-served" basis from the interest list, except that persons entering the demonstration through Money Follows the Person (MFP) are placed at the head of the interest list. These lists are managed on a statewide basis using a standardized assessment tool, and in

accord with criteria established by the state. Interest list policies are based on objective criteria and applied consistently in all geographic areas served.

(2) **Unduplicated Participant Slots for the 217-Like HCBS Group.** Table 5(a) below specifies the unduplicated number of participants for the 217-Like Group.

    (a) Column A reflects the following slots: (1) the number of unduplicated participant slots transferred from the STAR+PLUS 1915(c) waiver, TX 0862; (2) unduplicated participant slots transferred from the Community Based Alternatives (CBA) 1915(c) waiver, TX 0266; (3) individuals released from the interest list; and (4) individuals discharged from institutional care who are in the Money Follows the Person (MFP) Demonstration, in the areas of the state where the managed care expansion occurred.

    (b) Column B reflects the additional slots made available for the Nursing Facility Diversion Group, created June 1, 2013. The Nursing Facility Diversion Group was created as a subset of the STAR+PLUS 217- Like HCBS Group. This group consists of persons age 65 and older, and adults with physical disabilities age 21 and older, who meet the NF LOC as defined by the state, who qualify as members of the 217- Like HCBS Group, and who are at imminent risk of entering a nursing facility as a result of a catastrophic episode. Examples of a catastrophic episode include: (1) an individual is significantly dependent on a caregiver to remain in the community and the caregiver passes away or is suddenly no longer able to provide care; (2) an individual has a community support system but must suddenly move where there is no support system; (3) an individual has a sudden occurrence that would cause imminent placement in a nursing facility because he can no longer care for himself; or (4) an individual is identified by the Texas Department of Family and Protective Services as being at imminent risk of nursing facility placement. The number of nursing facility diversion group slots for each DY is listed in the chart below. Nursing Facility Diversion Group slots may be encumbered only by individuals identified as belonging to the Nursing Facility Diversion Group.

    (c) Column C reflects the additional slots added September 1, 2015 and September 1, 2016 after the 84th Legislature (Regular Session) of Texas appropriated additional funds to increase the number of unduplicated participants for the STAR+PLUS 217-Like Group served by the STAR+PLUS HCBS Program.

### Table 5(a). Unduplicated Number of Participants for the STAR+PLUS 217-Like HCBS group

| Demonstration Year | Column A | Column B | Column C | Total |
|---|---|---|---|---|
| DY 7 | 23,001 | 100 | 1,235 | 24,336 |
| DY 8 | 23,090 | 100 | 1,235 | 24,425 |
| DY 9 | 23,407 | 100 | 1,235 | 24,742 |
| DY 10 | 23,793 | 100 | 1,235 | 25,128 |
| DY 11 | 24,239 | 100 | 1,235 | 25,574 |
| DY 12 | 24,693 | 100 | 1,235 | 26,028 |

Complaint Exhibit 1, Page 35 of 86

| Demonstration Year | Column A | Column B | Column C | Total |
|---|---|---|---|---|
| DY 13 | 25,156 | 100 | 1,235 | 26,491 |
| DY 14 | 25,628 | 100 | 1,235 | 26,963 |
| DY 15 | 26,109 | 100 | 1,235 | 27,444 |
| DY 16 | 26,598 | 100 | 1,235 | 27,933 |
| DY 17 | 27,097 | 100 | 1,235 | 28,432 |
| DY 18 | 27,605 | 100 | 1,235 | 28,940 |
| DY 19 | 28,123 | 100 | 1,235 | 29,458 |

ii) **SSI-Related Eligibles.** Persons age 65 and older, and adults age 21 and older, with physical disabilities that qualify as SSI eligibles and meet the NF LOC as defined by the state. Table 5(b) below specifies the unduplicated number of participants for the SSI-Related Eligible HCBS Group.

(1) Column A column reflects the following slots: (1) the number of unduplicated participants transferred from the STAR+PLUS 1915(c) waiver, TX 0325; (2) the number of unduplicated participants transferred from the CBA 1915(c) waiver; and (3) individuals released from the interest list; and (4) individuals discharged from institutional care who are in the Money Follows the Person (MFP) Demonstration, in the areas of the state where the managed care expansion occurred.

**Table 5b. Unduplicated Number of Participants for the SSI-Related Eligible Group**

| Demonstration Year | Column A |
|---|---|
| DY 7 | 44,249 |
| DY 8 | 44,710 |
| DY 9 | 45,562 |
| DY 10 | 46,514 |
| DY 11 | 47,563 |
| DY 12 | 48,636 |
| DY 13 | 49,734 |
| DY 14 | 50,856 |
| DY 15 | 52,003 |
| DY 16 | 53,177 |
| DY 17 | 54,376 |
| DY 18 | 55,603 |

| Demonstration Year | Column A |
|---|---|
| DY 19 | 56,858 |

c) **Eligibility for STAR+PLUS HCBS Benefits.** Individuals can be eligible for HCBS under STAR+PLUS depending upon their medical and / or functional needs, financial eligibility designation as a member of the 217-Like STAR+PLUS HCBS Group or an SSI-related recipient, and the ability of the State to provide them with safe, appropriate, and cost-effective LTC services.

  i) Medical and / or functional needs are assessed according to LOC criteria published by the State in State rules. These LOC criteria will be used in assessing eligibility for STAR+PLUS HCBS benefits through the 217-Like or SSI-related eligibility pathways.

  ii) For an individual to be eligible for HCBS services, the State must have determined that the individual's cost to provide services is equal to or less than 202 percent of the cost of the level of care in a nursing facility.

d) **Freedom of Choice.** The service coordinators employed by the managed care organizations must be required to inform each applicant or member of any alternatives available, including the choice of institutional care versus home and community based services, during the assessment process. The Freedom of Choice Form must be incorporated into the Service Plan. The applicant or member must sign this form to indicate that he or she freely choices waiver services over institutional care. The managed care organization's service coordinator also addresses living arrangements, choice of providers, and available third party resources during the assessment.

e) The state, either directly or through its MCO contracts must ensure that participants' engagement and community participation is supported to the fullest extent desired by each participant.

f) **Conflict of Interest:** The state agrees that the entity that authorizes the services is external to the agency or agencies that provide the HCB services.  The state also agrees that appropriate separation of assessment, treatment planning and service provision functions are incorporated into the state's conflict of interest policies.

g) **HCBS Settings Requirements:** The state must assure compliance with the characteristics of HCBS settings as described in the 1915(c) regulations in accordance with implementation/effective dates as published in the Federal Register or guidance pertaining to the HCBS settings rule.

h) **HCBS Electronic Visit Verification System.**  The state will demonstrate compliance with the Electronic Visit Verification System (EVV) requirements for personal care services (PCS) by January 1, 2021 and home health services by January 1, 2023 in accordance with section 12006 of the 21st Century CURES Act, unless the state has received a good faith effort exemption for up to one year from CMS.

i) **Service Plan.** In accordance with 42 CFR § 441.301(c)(1), a participant-centered service plan of care must be developed using a person-centered planning process for each individual determined to be eligible for HCBS. All waiver services must be furnished pursuant to the written person-centered service plan that meets federal requirements at 42 CFR 441.301(c)(2), according to the projected frequency and type of provider. The service plan must also describe the other services, regardless of the funding source, and the informal supports that complement HCBS services in meeting the needs of the participant. The service plan is subject to the approval of the HHSC. Federal financial participation (FFP) may not be claimed for waiver services furnished prior to the development of the service plan or for services that are not included

Complaint Exhibit 1, Page 37 of 86

in the service plan. The State will use an electronic process for submission and approval of most individual service plans. Service plans for individuals turning 21, outside the cost ceiling, and the 217-Like Group will remain a manual process.  The person-centered service plan is reviewed, and revised upon reassessment of functional need as required by 42 CFR 441.365(e), at least every 12 months, when the individual's circumstances or needs change significantly, or at the request of the individual.

Complaint Exhibit 1, Page 38 of 86

j) **Benefit Package under the STAR+PLUS HCBS Program.** The following Table 6 describes the benefits available to HCBS participants, whether in the 217-Like HCBS Group or the SSI-related group, that are provider-directed and, if the participant elects the option, self-directed. The services are further defined in Attachment C.

**Table 6. HCBS Services**

| Service | Provider Directed | Participant Directed |
|---|---|---|
| Personal Assistance Service | X | X |
| Respite | X | X |
| Financial Management Services | X | |
| Support Consultation | X | X |
| Adaptive Aids and Medical Supplies | X | |
| Adult Foster Care | X | |
| Assisted Living | X | |
| Dental Services | X | |
| Emergency Response Services | X | |
| Home Delivered Meals | X | |
| Minor Home Modifications | X | |
| Nursing | X | X |
| Occupational Therapy | X | X |
| Physical Therapy | X | X |
| Speech, Hearing, and Language Therapy | X | X |
| Transition Assistance Services | X | |
| Cognitive Rehabilitation Therapy (Effective March 6, 2014) | X | X |
| Supported Employment Services (Effective September 1, 2014) | X | X |
| Employment Assistance Services (Effective September 1, 2014) | X | X |

k) **Self-Direction of Home and Community Based Services.** STAR+PLUS participants who elect the self-direction opportunity will have the option to self-direct all or some of the long term services, as identified in Table 4, under the Demonstration. The services, goods, and supports that a participant self-directs will still be included in the calculations of the participant's budget. Participant's budget plans will reflect the plan for purchasing these needed services, goods, and supports.

i) **Information and Assistance in Support of Participant Direction.** The state shall have a support system that provides participants with information, training, counseling, and assistance, as needed or desired by each participant, to assist the participant to effectively direct and manage their self-directed services and budgets. Participants shall be informed about self-directed care, including feasible alternatives, before electing the self-direction option. Participants shall also have access to the support system throughout the time that they are self-directing their care. Support activities must include, but are not limited to, financial management services and support consultation, defined as follows.

(1) **Financial Management Services.** Financial management services provide assistance to members with managing funds associated with the services elected for self-direction. Financial management services include initial orientation and ongoing training related to responsibilities of being an employer, and adhering to legal requirements for employers. The financial management services providers, referred to as the Financial Management Services Agency (FMSA), serves as the member's employer-agent, which is the Internal Revenue Service's (IRS) designation of the entity responsible for making payables and withholding, and filing and depositing taxes on behalf of the members. As the employer-agent, the FMSA files required forms and reports to the Texas Workforce Commission.

(2) **Support Consultation.** Support Consultation offers practical skills training and assistance to enable an individual to successfully direct those services the individual elects for participant-direction. This service is provided by a certified support advisor, and includes skills training related to recruiting, screening, and hiring workers, preparing job descriptions, verifying employment eligibility and qualifications, completion of documents required to employ an individual, management of workers, and development of effective back-up plans for services considered critical to the individual's health and welfare in the absence of the regular provider or an emergency situation. Support consultation is provided only by a certified support advisor certified by HHSC.

ii) **Participant Direction by Representative.** The participant who self-directs one or more services may appoint a volunteer designated representative to assist with or perform employer responsibilities to the extent approved by the participant. The participant documents the employer responsibilities, and that only a non-legal representative freely chosen by the participant or legally authorized representative may serve as the designated representative to assist in performance of employer responsibilities, to the extent desired by the individual or legally authorized representative. The participant documents the employer responsibilities that the designated representative may and may not perform on the participant's behalf.

iii) **Participant Budget Authority.** The participant's budget authority is operated and developed as follows:

(1) The participant has budget authority and decision-making authority over the budget to reallocate funds among services included in the budget; to determine the amount paid for services within the State's established limits; to substitute service providers and to schedule the provision of services;

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 33 of 79

to specify additional service provider qualifications consistent with established criteria; to specify the provision of services consistent with service specifications in Attachment C for services that may be self-directed as specified in Table 5; to identify service providers and refer for provider enrollment; to authorize payment for waiver goods and services; and to review and approve provider invoices for services rendered.

(2) All participants, in conjunction with the FMSA, must develop a budget based on the service plan. The amount of funds included in the service plan is calculated by the service planning team based on the planned waiver services and the adopted reimbursement rate. The service plan is developed in the same manner for the participant who elects to have services delivered through the consumer directed services option as it is for the participant who elects to have services delivered through the traditional provider-managed option.

With approval of the FMSA, the participant may make revisions to a specific service budget that does not change the amount of funds available for the service in the approved service plan. Revisions to the service plan amount available for a particular service, or a request to shift funds from one self-directed waiver service component to another, must be justified by the participant's service planning team and authorized by the MCO.

(3) Modifications to the participant directed budget must be preceded by a change in the service plan.

iv) **Disenrollment from Self-Direction.** A participant may voluntarily disenroll from the self-directed option at any time and return to a traditional service delivery system. A participant may also be involuntarily disenrolled from the self-directed option for cause, if continued participation in the consumer directed services option would not permit the participant's health, safety, or welfare needs to be met, or the participant or the participant's representative, when provided with additional support from the CDSA, or through Support Consultation, has not carried out employer responsibilities in accordance with the requirements of this option. If a participant is terminated voluntarily or involuntarily from the self-directed service delivery option, the State will transition the participant to the traditional agency direction option and will have safeguards in place to ensure continuity of services.

l) **Fair Hearing.** For standard and expedited appeals, members must exhaust the MCO's internal standard or expedited appeals process before making a request for a standard or expedited state fair hearing. Procedures related to state fair hearings are described in Attachment F.

m) **Participant Safeguards**. The state must follow all member safeguard procedures as described in Attachment G of these STCs.

## G. DELIVERY SYSTEM AND PROVIDER PAYMENT INITIATIVES IN MANAGED CARE CONTRACTS

29) **State Directed Payment Programs.** Pursuant to 42 CFR 438.6(c) and subject to prior CMS approval, as applicable, the state may direct expenditures for delivery system and provider payment initiatives (i.e., state directed payments) through its contracts with managed care plans. The state intends to submit requests for approval of state directed payments for the state's rating period from September 1, 2021-August 31, 2022, including the Comprehensive Hospital Increased

Reimbursement Program (CHIRP), the Texas Incentives for Physician and Professional Services (TIPPS) Program, the Rural Access to Primary and Preventive Services (RAPPS) Program, and the Directed Payment Program for Behavioral Health Services. The state may also submit requests to continue the Quality Incentive Payment Program (QIPP) or to create new programs, including an Ambulance Services Directed Payment Program. Description of a particular state directed payment in these STCs does not qualify as CMS approval, nor does it negate the approval and other requirements of 42 CFR 438.6(c).  Nothwithstanding these STCs, all federal standards and requirements under 42 CFR 438.6(c), or successor regulations, will apply.  All state directed payments must be based on the delivery and utilization of services to Medicaid beneficiaries covered under the contract delivered during the rating period and the services must be approved under an existing authority (e.g. Medicaid state plan, 1915(b) or 1915(c)). Payment cannot be conditioned upon historical data (services delivered or performance measured prior to the start of the rating period in question) nor can payment be conditioned upon completion or submission of a report.  The state may require providers as a condition of participation in a program to complete an application, including submitting required financial data to assist the state in completing required elements of the form described in STC 31 and STC 36, and other reports related to quality improvements or data to assist the state in completing required elements of STC 35.

30) **Requirements for State Submission of State Directed Payments**. For programs that must obtain CMS approval and are proposed to begin on September 1, 2021, the state and CMS will work collaboratively towards consideration of approval of state requests and will adhere to the milestones outlined in the subsequent STCs. The state must submit to CMS on a form prescribed by CMS its requests for state directed payments.

31) **CMS Initial Review of State Directed Payment Requests**. CMS will furnish to Texas in writing within 30 calendar days following receipt of the complete request for approval, all requests for information needed to assist CMS in evaluating the request, including but not limited to documentation necessary to:
   a. Determine compliance with 42 CFR 438.6(c) and all other applicable Federal requirements;
   b. Determination that the state directed payment is reasonable, appropriate and attainable;
   c. Determination, for any approved state directed payment prior to consideration for renewal, documentation of improvement in the quality measures identified in the state's approved evaluation plan; and
   d. Determination that the quality measures and evaluation plan for the requested state directed payment documents commitment to year over year improvement based on nationally recognized measures (e.g. Adult or Child Core Set, NQF core measure, etc.), or other quantifiable measures as agreed to by the state and CMS.

32) **State Response to Requests for Additional Information**. When CMS requests additional information in an effort to consider a request for approval, Texas will provide responses in writing to such requests for information within 15 calendar days following receipt of the requests for additional information.

Complaint Exhibit 1, Page 42 of 86

33) **CMS Review of the State's Response to Requests for Additional Information:** CMS will evaluate any information provided by the state by phone or in writing pursuant to the request for approval to determine whether CMS anticipates that the request may be considered approvable. If CMS determines that the request for approval is complete and complies with the requirements of 438.6(c), CMS will notify the state in writing within 20 calendar days of receipt of the state submitting complete responses to requests for information that CMS anticipates issuing a formal decision letter within 20 calendar days. If CMS identifies any outstanding matters that need technical or substantive modification in order for CMS to make a final decision, CMS will identify the matters and provide notification to the state in writing within 20 calendar days of receipt of the state submitting complete responses to requests for information.

34) **Additional Processing Requirements as needed**. If the state is notified by CMS that further modifications to the request are required, CMS and the state will meet by phone or other means at least every 2 business days until final consideration of the proposal. The state will respond with written modifications within 5 calendar days of receipt of written request for modifications.

35) **Approval Conditioned Upon Submission of Complete Evaluation Data**. Any approval of a one-year state directed payment proposal will be conditioned on the state submitting evaluation results within 18 months of the end of a rating period. For example, if a state directed payment was approved for SFY 2021 (September 1, 2020-August 31, 2021), the state must submit evaluation results specific to that SDP by February 1, 2023. Any approval of a multi-year state directed-payment proposal will be conditioned on the state submitting evaluation results within 18 months of the end of each annual rating period of the multi-year proposal. If the evaluation results are not received 18 months after the end of the applicable rating period(s), review of any future requests for the state directed payment will not begin until those evaluation results are received.

The state may also submit amendments to any approved state directed payment, as necessary, and CMS will review such amendment requests to determine whether they are approvable.

36) **Monitoring State Directed Payments**.
   a. CMS will assess compliance with the regulatory requirements through ongoing monitoring with the state, including but not limited to:
      i. Monthly monitoring calls with the state;
      ii. Monitoring reports as required in STC 74, including completion of the below State Directed Payment Reporting Chart for each state directed payment on an annual basis within the annual report.

**State Directed Payment reporting chart**:

| **Name of State Directed Payment** |
| --- |
| **Description of Payment (i.e., type of payment, such as minimum fee schedule, uniform increase, value based purchasing, etc.)** |

| Each Provider Receiving Payment | Total Amount of Directed Payment Each Provider Received | Federal Share of Directed Payment Each Provider Received | How is the state share of the Directed Payment financed (IGT, provider tax, etc.)? | Does the provider finance the state share for the Directed Payment? If so, how much? | Provider type/class | Results of Each Performance Metric Associated with this Directed Payment for Each Provider |
|---|---|---|---|---|---|---|
| A | | | | | | |
| B | | | | | | |
| C | | | | | | |
| Total | | | | | | |

# V. FUNDING POOLS UNDER THE DEMONSTRATION

The terms and conditions in Section V apply to the state's exercise of the following Expenditure Authorities: Expenditures Related to the Uncompensated Care Pool, and Expenditures Related to the Delivery System Incentive Reform Payment (DSRIP) Pool.

37) **Terms and Conditions Applying to Pools Generally.**

   a) The non-Federal share of pool payments to providers may be funded by state general revenue funds, transfers from units of local government, and certified public expenditures that are compliant with section 1903(w) of the Act. Any payments funded by intergovernmental transfers must remain with the provider, and may not be transferred back to any unit of government.

   b) The state must inform CMS of the funding of all payments from the pools to hospitals or other providers through a quarterly payment report to be submitted to CMS within 60 days after the end of each quarter. This report must identify the funding sources associated with each type of payment received by each provider.

   c) The state will ensure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope or quality of services available under the State plan or this Demonstration. The preceding sentence is not intended to preclude the state from modifying the Medicaid benefit through the State Plan amendment process.

38) **Uncompensated Care (UC) Pool.** Payments from this pool may be used to defray the actual uncompensated cost of medical services that meet the definition of "medical assistance" contained in section 1905(a) of the Act, that are provided to uninsured individuals as charity care by hospitals, clinics, or by other provider types, as specified at subparagraph (c) below, including uninsured full or partial discounts, that provide all or a

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 37 of 79

portion of services free of charge to patients who meet the provider's charity care policy and that adhere to the charity care principles of the Healthcare Financial Management Association.[2] Annual UC Pool payments are limited to the annual amounts identified in STC 41. Expenditures for UC payments must be claimed in accordance with CMS-approved claiming protocols for each provider type and application form in Attachment H. The methodology used by the state to determine UC payments will ensure that payments to hospitals, clinics, and other providers are distributed based on uncompensated cost, without any relationship to source of non-federal share, as specified in Attachment H. UC payments are not associated with particular individuals and are not a form of health coverage or any other benefit inuring to individuals.

a) **UC Application.** To qualify for a UC Payment, a provider must submit to the state an annual UC Application that will collect cost and payment data on services eligible for reimbursement under the UC Pool. Data collected from the application will form the basis for UC Payments made to individual hospitals and non-hospital providers. The state must require hospitals to report data in a manner that is consistent with the Medicare Form 2552-10 cost report, or for non-hospital providers, a CMS-approved cost report consistent with Medicare cost reporting principles.

    i) Cost and payment data included on the application must be based on the Medicare 2552-10 cost report, or for non-hospital providers, a CMS-approved cost report consistent with Medicare cost reporting principles. For hospitals and physician groups, data on the application is for the federal fiscal year (FFY) that is two years prior to the DY in which UC Payments are to be made, in order to allow time for providers to finalize their cost reports from that data year and submit their application data to HHSC. (For example, FFY 2010 was the data year for UC Payments under the UC pool in DY 1). The state may trend the data to model costs incurred in the year in which payments are to be made. HHSC or its designee will reconcile estimates for prior years. If trending is used, the base year can be no older than 2 years old and must be tied to a generally recognized and widely published trending factor used for trending health care costs. For hospitals not required to report charity care uncompensated costs on their cost reports, the hospital must report the required data in the tool approved by CMS and included in Attachment H. Any overpayments identified in the reconciliation process that occurred in a prior year must be recouped from the provider, with the FFP returned to CMS, except that during the reconciliation process, if a provider demonstrates that it has allowable uncompensated costs consistent with the protocol that were not reimbursed through the initial UC Payment (based on application figures), and the state has available UC Pool funding for the year in which the costs accrued, the state may provide reimbursement for those actual documented unreimbursed UC costs through a prior period of adjustment. For ambulance and dental providers, data on the application is based on actual eligible costs incurred during the demonstration year for which the payments are made.

    ii) When submitting the UC Application, providers may request that cost and payment data from the data year be adjusted to reflect increases or decreases in costs, resulting from changes in operations or circumstances. A provider may request that:

        (1) Costs and revenue not reflected on the filed cost report, but which would be incurred for the program year, be included when calculating payment amounts; or

        (2) Costs and revenue reflected on the filed cost report, but which would not be incurred for the program year, be excluded when calculating payment amounts.

---

[2] Available at http://www.hfma.org/WorkArea/DownloadAsset.aspx?id=14589.

Adjustments described in subparagraphs (1) and (2) above cannot be considered as part of the reconciliation of a prior year payment. Such costs must be properly documented by the provider, and are subject to review by the State. Such costs are subject to reconciliation to ensure that providers actually incurred such eligible uncompensated costs.

iii) All applicable inpatient and outpatient hospital UC payments received by a hospital provider count as title XIX revenue, and must be included as offsetting revenue in the State's annual DSH audit reports. Providers receiving both DSH and UC Payments cannot receive total payments under the State plan and the UC Pool (related to inpatient and outpatient hospital services) that exceed the hospital's total eligible uncompensated costs for those services. UC Payments for physicians, non-physician professionals, pharmacy, and clinic costs are not considered inpatient or outpatient Medicaid payments for the purpose of annual hospital specific DSH limits and the DSH audit rule. All reimbursements must be made in accordance with CMS approved cost-claiming protocols that are consistent with the Medicare Form 2552-10 cost report or, for non-hospital providers, a CMS approved cost report consistent with Medicare cost reporting principles.

b) **UC Payment Protocol.** The state has completed this action and the protocol is in Attachment H. The UC Payment Protocol, also known as the funding and reimbursement protocol, establishes rules and guidelines for the State to claim FFP for UC Payments. The approved UC Payment Protocol is appended into these STCs as Attachment H. By March 30, 2018, the state must submit for CMS approval an addendum to the funding and reimbursement protocol that will establish rules and guidelines for the State to claim FFP for UC Payments beginning in DY 9 (October 1, 2019 through September 30, 2020). CMS and Texas will work collaboratively with the expectation of CMS approval of the protocol within 90 calendar days after it receives the addendum. The state cannot claim FFP for any UC Payments for DY 9 or later until a UC Protocol addendum has been submitted to and approved by CMS. The UC Payment Protocol addendum must include precise definitions of eligible uncompensated provider charity care costs (consistent with the Medicare cost reporting principles and revenues that must be included in the calculation of uncompensated charity care cost for purpose of reconciling UC payments to unreimbursed charity care cost). The Protocol will also identify the allowable source documents to support costs; it will include detailed instructions regarding the calculation and documentation of eligible costs, the tool used by the State and providers to apply for UC Payments, and a timetable and reconciliation of payments against actual charity care cost documentation. This process will align the application process (based on prior cost periods) to the reconciliation process (using the application costs from subsequent years to reconcile earlier payments). The Protocol will contain not only allowable costs and revenues, it will also indicate the twelve (12) month period for which the costs will apply.

The State must submit a UC Payment Protocol addendum for each non-hospital provider type that may seek UC payments. FFP will not be available for UC Payments made to a non-hospital provider type for DY 9 or later until a cost-claiming protocol addendum consistent with the Medicare cost reporting principles is approved by CMS for the relevant non-hospital provider type.

c) **UC Payments to Non-Hospital Providers.** UC Payments may be provided only to the following qualifying non-hospital providers: physician practice groups, government ambulance providers, and government dental providers. UC Payments are considered to be Medicaid payments to providers and

Complaint Exhibit 1, Page 46 of 86

must be treated as Medicaid revenue when determining total title XIX funding received, in particular for any provider utilizing certified public expenditures as the non-Federal share of a Medicaid payment.

d) **Reporting Requirements for UC Payments**. The state will submit to CMS two reports related to the amount of UC Payments made from the UC Pool per Demonstration Year. The reporting requirements are as follows:

i) By December 31st of each Demonstration Year, the State shall provide the following information to CMS:

(1) The UC payment applications submitted by eligible providers; and

(2) A chart of estimated UC Payments to each provider for a DY.

ii) Within ninety (90) days after the end of each Demonstration year, the State shall provide the following information to CMS:

(1) The UC Payment applications submitted by eligible providers; and

(2) A chart of actual UC payments to each provider for the previous DY.

39) **Public Health Providers Charity Care Pool (PHP-CCP).** From October 1, 2021, through September 30, 2022, payments from the PHP-CCP may be used to defray the actual uncompensated cost of eligible or uninsured individuals incurred by qualifying providers.  For purposes of the PHP-CCP, qualifying providers are limited to publicly-owned and operated community mental health clinics (CMHCs), local behavioral health authorities (LBHAs), and local mental health authorities (LMHAs), local health departments (LHDs), and public health districts (PHDs), as agreed upon by CMS and the state and defined at subparagraph (c) of this STC. For DYs 11 and 12, publicly-owned and operated CMHCs, LBHAs, LMHAs, LHDs, and PHDs that are participating in the PHP-CCP may receive payments from the pool not to exceed $500 million per federal fiscal year.  Starting October 1, 2022, payments from this pool may be used to defray the actual uncompensated cost discounts, that provide all or a portion of services free of charge to patients who meet the provider's charity care policy and that adhere to the charity care principles of the Healthcare Financial Management Association.[3]  For DY 13 through 19, annual aggregate PHP-CCP Pool payments are limited to the annual amounts identified in STC 41.  Expenditures for PHP-CCP payments must be claimed in accordance with CMS-approved claiming protocols for each provider type.  The methodology used by the state to determine PHP-CCP payments to the state an annual PHP-CCP Application that will collect cost and payment data on services eligible for reimbursement under the PHP-CCP.  Data collected from the application will form the basis for PHP-CCP Payments made to CMHCs, LBHAs, LMHAs, LHDs, and PHDs. The methodology used by the state to determine PHP-CCP payments to individual providers must ensure that payments to CMHCs, LBHAs, LMHAs, LHDs, and PHDs are distributed based on the provider's actual uncompensated care costs, without any relationship to the provider's status as a source of non-federal share, as specified in Attachment T. Payments to providers must not exceed the provider's actual uncompensated care costs, except in the first year of the program's operations during which providers may also receive reimbursement not to exceed their actual Medicaid shortfall.  PHP-CCP payments are not associated with particular individuals and are not a form of health coverage or any other benefit inuring to individuals.

a) **PHP-CCP Application.** To qualify for a PHP-CCP Payment, a provider must submit to the state an annual PHP-CCP Application that will collect cost and payment data on services eligible for reimbursement under the PHP-CCP.  Data collected from the application will form the basis for PHP-

---

[3] Available at http://www.hfma.org/WorkArea/DownloadAsset.aspx?id=14589.

Complaint Exhibit 1, Page 47 of 86

CCP Payments made to CMHCs, LBHAs, LMHAs, LHDs, and PHDs. The state must require providers to report data in a manner that is consistent with a CMS-approved cost report consistent with Medicare cost reporting principles.

    i) For all demonstration years except DY11, cost and payment data included on the application must be based on the CMS-approved cost report consistent with Medicare cost reporting principles. For all provider groups, data on the application is based on actual eligible costs incurred during the demonstration year for which the payments are made.

    ii) For all demonstration years, any publicly-owned and operated provider that is able to certify public expenditures that fall under the provider types described in subpart (c) of this STC may submit a PHP-CCP Application to be eligible to receive a PHP-CCP Payment.

b) **PHP-CCP Payment Protocol.** The PHP-CCP Payment Protocol, also known as the funding and reimbursement protocol, establishes rules and guidelines for the State to claim FFP for PHP-CCP Payments and will be appended these STCs as Attachment T, which will be approved subsequent to this extension reward. By June 30, 2021, HHSC must revise, test, and obtain CMS approval of the application tools used to collect the information needed to determine the eligibility of providers to participate in the PHP-CCP pool and their eligible uncompensated costs, as described in the protocol for DY 11. By August 31, 2021, the state must submit for CMS approval an addendum to the funding and reimbursement protocol that will establish rules and guidelines for the State to claim FFP for PHP-CCP Payments beginning in DY 12 (October 1, 2022 through September 30, 2023). CMS and Texas will work collaboratively with the expectation of CMS approval of the protocol within 90 calendar days after it receives the Attachment T. The state cannot claim FFP for any PHP-CCP Payments for DY 12 or later until a PHP-CCP Protocol addendum has been submitted to and approved by CMS. The PHP-CCP Payment Protocol addendum must include precise definitions of eligible uncompensated provider charity care costs (consistent with the Medicare cost reporting principles and revenues that must be included in the calculation of uncompensated charity care cost for purpose of reconciling PHP-CCP payments to unreimbursed charity care cost), which will apply to the protocol beginning in DY12 (October 1, 2022-September 30, 2023). The Protocol will also identify the allowable source documents to support costs; it will include detailed instructions regarding the calculation and documentation of eligible costs, the tool used by the State and providers to apply for PHP-CCP Payments. The Protocol will contain allowable costs and revenues and indicate the twelve (12) month period for which the costs will apply.

c) **PHP-CCP Payments to Providers.** Publicly-owned and operated Community Centers, Local Mental Health Authorities, or Local Behavioral Health Authorities providing behavioral health services under Chapter 533 or Chapter 534 of the Texas Health & Safety Code and publicly-owned and -operated Local Health Departments (LHDs) and public health districts (PHDs) that are established under the Texas Health and Safety Code, Title 2, Subtitle F, Chapter 121 are eligible to participate in the PHP-CCP. To participate in the PHP-CCP, the governmental entity must be able to certify public expenditures. PHP-CCP Payments may be provided only to publicly-owned and operated CMHCs, LMHAs, LBHAs, LHDs, and PHDs. PHP-CCP Payments are considered to be Medicaid payments to providers and must be treated as Medicaid revenue when determining total title XIX funding received, in particular for any provider utilizing certified public expenditures as the non-Federal share of a Medicaid payment.

d) **Reporting Requirements for PHP-CCP Payments**. The state will submit to CMS, within ninety (90) days after the end of each Demonstration year:

    (1) The PHP-CCP Payment applications submitted by eligible providers; and

(2) A chart of actual PHP-CCP payments to each provider for the previous DY.

e) **Required Milestones for PHP-CCP Pool Transition.** CMS expects Texas will work in good faith to implement all requirements specified in these STCs, and in particular this STC 39, within the necessary timeline. To help ensure the state is making adequate progress toward meeting these requirements on the required timetable, the state must satisfy the milestones specified in this sub-STC 39(e). If Texas fails to meet any one or more of them, the deferral process contemplated in STC 71 will apply to each deliverable (relating to solely the process and not the financial penalties invoked in that STC; the financial penalties below will apply).

   i) Submit and implement the revised Attachment T by DY12: Texas is required to submit the addendum to Attachment T (the PHP-CCP Payment Protocol) that is described in paragraph (b) of this STC for CMS review by August 31, 2021. The methodology described in the addendum must be implemented as part of the revised PHP-CCP distribution methodology for DY 12 (October 1, 2022-September 30, 2023).

   (1) CMS will permanently reduce Texas' PHP-CCP expenditure authority by 20 percent for DY 12 (October 1, 2022-September 30, 2023) and disallow funding that exceeds the reduced expenditure authority amount if Texas has not submitted a draft addendum to Attachment T to CMS by June 30, 2021.

   (2) Texas may not claim FFP for PHP-CCP payments for DY 12 (October 1, 2022-September 30, 2023) until CMS has approved the addendum to Attachment T.

   (3) Texas may claim FFP for DY 12 after it has received CMS approval and implemented the addendum to Attachment T, up to the annual limit (which is subject to reduction pursuant to sub-STC 39(e)(i)(D), below).

   (4) If Texas has not demonstrated to CMS it has implemented the methodology described in the addendum to Attachment T by October 1, 2022 (DY12), CMS will permanently reduce Texas' PHP-CCP pool expenditure authority by 20 percent for DY 12 and disallow funding that exceeds the reduced expenditure authority amount.

   ii) Revise PHP-CCP applications for PHP-CCP eligible providers: After HHSC receives CMS approval of the addendum to Attachment T (PHP-CCP Payment Protocol), and concurrent with the state administrative rule amendment timeframe (see sub- STC 39(e)(iii), below), HHSC must revise, test, and obtain CMS approval of the application tools used to collect the information needed to determine the eligibility of providers to participate in the UC pool and their eligible uncompensated costs, as described in the protocol.

   (1) CMS will permanently reduce Texas' PHP-CCP expenditure authority by 20 percent for DY 12 and disallow funding that exceeds the reduced expenditure authority amount if Texas has not submitted draft revised PHP-CCP application tools for eligible providers to CMS by February 28, 2022, or if CMS has not approved revised PHP-CCP tools for all provider types by June 30, 2022.

   iii) Amend the administrative rules that govern the program: Once HHSC has received CMS approval of the addendum to Attachment T (PHP-CCP Payment Protocol), and concurrent with its revision of the PHP-CCP applications for all provider types, HHSC must conduct the state administrative rulemaking process to amend the state's administrative rules governing the PHP-CCP pool with respect to each provider type to comport with the requirements of these STCs. The state has indicated

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 42 of 79

Complaint Exhibit 1, Page 49 of 86

that the rule development timeline is normally six-to- nine months, including the notice and comment periods required by state law.

(1) CMS will permanently reduce Texas' PHP-CCP expenditure authority by 20 percent for DY11 and disallow funding that exceeds the reduced expenditure authority amount unless Texas begins the necessary administrative rule amendment process required to implement the PHP-CCP pool distribution changes required by these STCs by no later than May 31, 2021.  Texas must demonstrate to CMS that it is undertaking rulemaking to amend the Texas Administrative Code (TAC) to implement the required PHP-CCP pool distribution methodology changes; this will be demonstrated by publishing a notice of the proposed rulemaking in the Texas Register and notice of a public hearing related to that rulemaking.

(2) CMS will permanently reduce Texas' PHP-CCP expenditure authority by an additional 20 percent for DY12 and disallow funding that exceeds the reduced expenditure authority amount unless Texas has published the necessary final administrative rules to implement the required PHP-CCP pool distribution methodology by July 31, 2022. The amended rules must be effective no later than September 30, 2022.  Texas must demonstrate this by sending CMS a copy of the final rule as published in the Texas Register.

iv) If Texas's PHP-CCP expenditure authority is reduced more than once for a DY, the reductions are applied cumulatively.[4]

40) **Delivery System Reform Incentive Payment (DSRIP) Pool.** The DSRIP program ends after September 30, 2021. Until it expires, the DSRIP Pool is available for the development of a program of activity that supports providers' efforts to enhance access to health care, the quality of care, and the health of the patients and families they serve. The program of activity funded by the DSRIP shall be based in Regional Healthcare Partnerships (RHPs) that are directly responsive to the needs and characteristics of the populations and communities comprising the RHP. Each RHP will have geographic boundaries, and will be directed by a public hospital or a local governmental entity.  In collaboration with participating providers, the public hospital or local governmental entity will develop a delivery reform and incentive plan that is rooted in the intensive learning and sharing that will accelerate meaningful improvement within the providers participating in the RHP. Individual providers' DSRIP proposals must flow from the RHP plans, and be consistent with the providers' shared mission and quality goals within the RHP, as well as CMS's overarching approach for improving health care through the simultaneous pursuit of three aims: better care for individuals (including access to care, quality of care, and health outcomes; better health for the population; and lower cost through improvement (without any harm whatsoever to individuals, families or communities) (the Three Part Aim).

Starting with DY 7, DSRIP will be temporarily extended with the goal of identifying non- DSRIP funding to continue financing these activities, and an updated methodology, reflecting an evolution from project-level reporting to provider core activities supporting performing provider-level outcomes that measure continued transformation of the Texas healthcare system. Performing providers are named in RHP plans to be eligible to receive DSRIP payments. DSRIP in this extension will support performing providers to move further towards

[4] For one reduction in a DY, multiply the original UC pool limit by $(1 - 0.20)$. For two reductions in a DY, multiply the reduced UC pool limit again by $(1 - 0.20)$, or equivalently, multiply the original UC pool limit by $(1 - 0.20) \times (1 - 0.20)$.
[5] For a description of CMS's current policies related to budget neutrality for Medicaid demonstration projects authorized under section 1115(a) of the Act, see State Medicaid Director Letter #18-009.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                        Page 43 of 79

Complaint Exhibit 1, Page 50 of 86

sustainability of their transformed systems outside of the DSRIP funding structure, which could include development of Alternative Payment Models (APMs) to continue services for Medicaid beneficiaries within managed care or FFS funding structures, and to low-income or uninsured individuals outside of the Medicaid program after the demonstration ends. Further operational details (such as the definitions of categories, terms and processes below) will be delineated in the protocols.

DSRIP payments are not associated with particular individuals and are not a form of health coverage or any other benefit inuring to individuals.

a) **Focus Areas.** There are 4 areas for which funding is available under the DSRIP, each of which has explicit connection to the achievement of the Three Part Aim. Activities will be identified within the following categories, and included in the full list of projects provided in the Measure Bundle Protocol (Attachment R)

   i) **Category A: Required reporting in order to be eligible for any amount of DSRIP payment** – Providers will describe transition from DY 2-6 to DY 7-8 activities, and specifically address the following.

   1. Core activities – Report on performance improvement projects designed to enhance achievement on Category C measure goals.
   2. Alternative Payment Methodology (APM) – Report on provider's progress toward, or implementation of, APM arrangements.
   3. Costs and savings – Performing providers with greater than $1M total valuation will submit costs and forecasted/generated savings for at least one core activity. Valuations are described in Attachment J.
   4. Collaborative activities - Performing providers will attend at least one learning collaborative, stakeholder forum, or other stakeholder meeting annually.

   ii) **Category B: Report on Medicaid and Low-income or Uninsured (MLIU) Patient Population by Provider (PPP)** – Performing providers must maintain or increase number of MLIU individuals served each DY, within allowable variation specified in the protocols.

   iii) **Category C: Measure Bundles and Measures** – Providers will select and report on health care quality and system performance measures, selected from a menu of pre-determined Measure Bundles or measures, and be rewarded based on meeting targeted improvement goals.

   iv) **Category D: Statewide Reporting Measure Bundle** – Providers will report on a statewide reporting Measure Bundle of population health measures for their provider type, to gain information on and understanding of the health status of key populations and to build the capacity for reporting on a comprehensive set of population health metrics.

b) **Regional Healthcare Partnerships.** Regional Healthcare Partnerships will be maintained throughout the state to coordinate regional planning, information sharing, and ongoing collaborative activities among DSRIP providers.  Each RHP will include a variety of healthcare providers to adequately respond to the needs of the community, and the process of maintaining each RHP and developing RHP plans will evidence meaningful participation by all interested providers.  Each RHP will be anchored (i.e. single point of contact for the RHP) by a public hospital (or in areas with no public hospital, anchored by a local

governmental entity) that will be responsible for developing the RHP's DSRIP plan in coordination with other identified RHP providers.

c) **DSRIP Plans within the RHP.** RHP anchoring entities will develop RHP plans in good faith, to leverage public and non-public hospital and other community resources to best achieve delivery system transformation goals within RHP areas consistent with the Demonstration's requirements. RHP anchoring entities shall provide opportunities for public input to the development of RHP plans, and shall provide opportunities for discussion and review of proposed RHP plans prior to plan submission to the state. In accordance with the guidelines specified in the DSRIP protocols (see STC 40(d)), a final RHP DSRIP Plan must include maximum payment amounts for DSRIP Payments. These amounts may be proportionally adjusted based on available non-Federal share.

d) **DSRIP Plans and Protocols.** The state may not claim DSRIP funding after January 1, 2018, for DSRIP DY 7-10, until the milestones discussed in this paragraph have been met.

   i) Within one month of the approval of this second extension, CMS, the state and Texas providers will, through a collaborative process, finalize updates to the RHP Planning Protocol (Attachment I), Program Funding and Mechanics Protocol (Attachment J), or other protocol documents as the state may propose to implement the DSRIP program as described above.

   ii) The updated protocols must include information on state and CMS review and approval processes for RHP Plan Updates, RHP and State reporting requirements, how potential DSRIP incentive payment amounts will be distributed to Performing Providers and to RHPs, mechanisms and payment methodologies.

   iii) Texas may not claim FFP for DSRIP payments after January 1, 2018 for DSRIP DY 7-10, or later until after updated protocols for those DYs have been approved by CMS.

e) **DSRIP Payments are Not Direct Reimbursement for Expenditures or Payments for Services.** Payments from the DSRIP pool are intended to support and reward hospital systems and other providers for improvements in their delivery systems that support the simultaneous pursuit of improving the experience of care, improving the health of populations, and reducing per capita costs of health care. Payments from the DSRIP Pool are not considered patient care revenue, and shall not be offset against disproportionate share hospital expenditures or other Medicaid expenditures that are related to the cost of patient care (including stepped down costs of administration of such care) as defined under these Special Terms and Conditions, and/or under the State Plan.

f) **DSRIP Expenditure Reporting**. Texas will submit total DSRIP expenditures, including payments to providers reflecting the basis for incentive payments, 6 months after the end of each demonstration year.

41) **Limits on Pool Payments.** Expenditures eligible for FFP for UC Pools and DSRIP Pool in each DY may not exceed the amounts shown in Table 7.

a) **Reassessment of Hospitals' Uncompensated Charity Care (UCC) in 2022.** CMS and Texas agree that UC Pool limits for DY 12-16 will be revised based on a reassessment of the amount of uncompensated charity care cost provided by Texas hospitals, to take place by September 1, 2022. The state and CMS will collaborate on the reassessment, which will be based on information reported by hospitals for periods beginning in federal fiscal year 2019 on schedule S-10 of the CMS 2552-10 hospital cost report, with adjustment to ensure that demonstration pool payments do not enter the calculation, following a methodology approved by CMS. For non-S-10 hospitals, costs will be based on the CMS-approved cost reports described in Attachment H for the most recent available year. The results of the reassessment will

Complaint Exhibit 1, Page 52 of 86

be used to revise the UC Pool limits for DY 12-*16*.  CMS and Texas are using 2019 to avoid any impact to data caused by the public health emergency that was in effect in 2020 and after.

b) If the reassessment discussed in (a) is not completed to produce an updated UC Pool limit by October 1, 2022, all payments from the Hospital UCC pool will be unavailable until the reassessment is complete.

c) When 2019 S-10 data as specified in 41(a) becomes available, the state and CMS will collaborate to recalculate the UC pool limits for DY 12-*16* based on this updated information.  The recalculated UC pool limits will become the final UC pool limits for DY 12-16.  In addition to prospectively modifying the UC pool limits based on this recalculation, CMS and the state will perform a reconciliation of UC pool payments made on or after October 1, 2021.  If UC pool payments for the reconciliation period have exceeded the final UC pool limit for that period, CMS will reclaim overpayments for these years.  If the UC pool payments for the reconciliation period were less than the final UC pool limit, CMS will provide FFP for additional payments consistent with the final UC pool limits so that Texas may make additional payments to providers for UC costs.

d) **Reassessment of Hospitals' Uncompensated Charity Care in 2027.** CMS and Texas agree that UC Pool limits for DY 17-19 will be revised based on a reassessment of the amount of uncompensated charity care cost provided by Texas hospitals, to take place by September 1, 2027. The state and CMS will collaborate on the reassessment, which will be based on information reported by hospitals for periods beginning in federal fiscal year 2025 on schedule S-10 of the CMS 2552-10 hospital cost report, with adjustment to ensure that demonstration pool payments do not enter the calculation, following a methodology approved by CMS. For non-S-10 hospitals, costs will be based on the CMS-approved cost reports described in Attachment H for the most recent available year. The results of the reassessment will be used to revise the UC Pool limits for DY 17-19.

e) If the reassessment discussed in 41(d) is not completed to produce an updated UC Pool limit by September 1, 2027, all payments from the Hospital UCC pool will be unavailable until the reassessment is complete.

f) When 2025 S-10 data as specified in 41(d) becomes available, the state and CMS will collaborate to recalculate the UC pool limits for DY 17-19 based on this updated information. The recalculated UC pool limits will become the final UC pool limits for DY 17-19.  In addition to prospectively modifying the UC pool limits based on this recalculation, CMS and the state will perform a reconciliation of UC pool payments made on or after October 1, 2027.  If UC pool payments for the reconciliation period have exceeded the final UC pool limit for that period, CMS will reclaim overpayments for these years.  If the UC pool payments for the reconciliation period were less than the final UC pool limit, CMS will provide FFP for additional payments consistent with the final UC pool limits so that Texas may make additional payments to providers for UC costs.

g) **Reassessment of PHP-CCP' Uncompensated Charity Care.**  CMS and Texas agree that PHP-CCP Pool limits for DY 13-17 will be revised based on a reassessment of the amount of uncompensated charity care cost provided by Texas CMHCs, LBHAs, LMHAs, LHD, and PHDs to take place by September 1, 2023.  The state and CMS will collaborate on the reassessment, which will be based on the CMS-approved cost reports described in Attachment T for the most recent available year.  The results of the reassessment will be used to revise the PHP-CCP Pool limits for DY 13-*17*.

h) If the reassessment of PHP-CCP Pool limits discussed in 41(g) is not completed to produce an updated PHP-CCP Pool limit by September 1, 2023, all payments from the pool will be unavailable until the reassessment is completed.

Complaint Exhibit 1, Page 53 of 86

i) When cost report data specified in 41(g) becomes available, the state and CMS will collaborate to recalculate the PHP-CCP pool limits for DY 13-*17* based on this updated information.  The recalculated PHP-CCP pool limits will become the final PHP-CCP pool limits for DY 13-17.

j) CMS and Texas will perform another reassessment of PHP-CCP pool limits for DY 18-19 by September 1, 2027, following the same parameters.  The recalculated PHP-CCP pool limits will become the final PHP-CCP pool limits for DY 18-19.  If the reassessment of PHP-CCP Pool limits discussed herein is not completed to produce an updated PHP-CCP Pool limit by September 1, 2027, all payments from the pool will be unavailable until the reassessment is completed.

**Table 7. Pool Allocations According to Demonstration Year (total computable)**

| Type of Pool | DY 6* (2016-2017) | DY 7* (2017-2018) | DY 8 (2018- 2019) | DY 9 (2019- 2020) | DY 10 (2020-2021) | DY 11 (2021-2022) |
|---|---|---|---|---|---|---|
| UC | 3,100,000,000 | 3,101,776,278 | 3,101,776,278 | 3,873,206,193 | 3,873,206,193 | 3,873,206,193 |
| PHP-CCP | | | | | | $500,000,000 |
| DSRIP | 3,100,000,000 | 3,100,000,000 | 3,100,000,000 | 2,910,000,000 | 2,490,000,000 | 0^ |

| Type of Pool | DY 12 (2022-2023) | DY 13 (2023-2024) | DY 14 (2024- 2025) | DY 15 (2025- 2026) | DY 16 (2026-2027) |
|---|---|---|---|---|---|
| UC | $4,512,075,400 | $4,512,075,400 | $4,512,075,400 | $4,512,075,400 | $4,512,075,400 |
| PHP-CCP | $500,000,000 | TBD | TBD | TBD | TBD |
| DSRIP | 0^ | 0 | 0 | 0 | 0 |

| Type of Pool | DY 17 (2027-2028) | DY 18 (2028-2029) | DY 19 (2029- 2030) |
|---|---|---|---|
| UC | TBD | TBD | TBD |
| PHP-CCP | TBD | TBD | TBD |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                                           Page 47 of 79

| Type of Pool | DY 17 (2027-2028) | DY 18 (2028-2029) | DY 19 (2029- 2030) |
|---|---|---|---|
| DSRIP | 0 | 0 | 0 |

*Amounts shown for DY 6 are reduced by 20 percent from the amounts shown in the terms and conditions for the 15-month extension, to reflect redefinition of DY 6 to be 12 months instead of 15 months. Amounts for DY 7 include the 20 percent of adjustment formerly shown as part of DY 6.

^ Incentive payments may be made in DY 11 and DY 12 for prior periods of performance and administrative activities to close out the DSRIP program.  Total DSRIP payments for the section 1115 demonstration may not exceed total authorized limits.

**42) Assurance of Budget Neutrality.**
   a)  By October 1 of each year, the State must submit an assessment of budget neutrality to CMS, including a summation of all expenditures and member months already reported to CMS, estimates of expenditures already incurred but not reported, and projections of future expenditures and member months to the end of the Demonstration, broken out by DY and Medicaid Eligibility Group (MEG) or other spending category.
   b)  Should the report in (a) indicate that the budget neutrality Annual Target for any DY has been exceeded, or is projected to be exceeded, the State must propose adjustments to the limits on UC Pool and DSRIP Pool limits, such that the Demonstration will again be budget neutral on an annual basis, and over the lifetime of the Demonstration.  The new limits will be incorporated through an amendment to the Demonstration.

**43) Transition Plan for DSRIP Pool.**
   a)  Texas submitted a DSRIP transition plan to CMS on September 30, 2019 and it was approved by CMS on September 2, 2020, which describes how the state DSRIP program will hand off to other programs, such as Texas initiatives like the Value Based Purchasing (VBP) roadmap to further develop its delivery system reform efforts without DSRIP funding and/or phase out DSRIP funded activities.  The final transition plan is Attachment Q of the STCs for this demonstration.  As Texas' DSRIP is a time-limited federal investment that will conclude by October 2021, Texas will propose milestones by which it will be accountable for measuring sustainability of its delivery system reform efforts absent DSRIP funding. Milestones may relate to the use of alternative payment models, the state's adoption of managed care payment models, payment mechanisms that support providers' delivery system reform efforts, and other opportunities.
   b)  Portions of overall FFP for DSRIP will be at-risk for the state's achievement on achievement milestones, as specified below.  If Texas fails to submit a complete sustainability plan by October 1, 2019, CMS will defer 10 percent of FFP for DSRIP funding starting in the next quarter, and an amount in all subsequent quarters indefinitely until the state comes into compliance.  Accountability for performance on these milestones will be as follows: an additional 15 percent for FFP for DSRIP will be at risk in demonstration year 9, and additional 20 percent off FFP for DSRIP will be at risk in demonstration year 10.
   c)  This deliverable will not be subject to the deferral as described to STC 71; all accountability for the Transition Plan will be applied as per this STC.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                                          Page 48 of 79

Complaint Exhibit 1, Page 55 of 86

# VI. HEALTH IT

**44) Health Information Technology.** This STC is specifically related to the purposes of this demonstration. The plans envisioned in this section however should be aligned with the state's broader State Medicaid Health IT Plan (SMHP).  The state will use Health Information Technology ("Health IT") to link services and core providers across the continuum of care to the greatest extent possible.  The state is expected to achieve minimum standards in foundational areas of Health IT and to develop its own goals for the transformational areas of Health IT use. The state will discuss how it plans to meet the Health IT goals/milestones outlined below. Through Semi-Annual Reporting, the state will further enumerate how it has, or intends to, meet the stated goals.  This STC is not subject to STC 71.

a)  The state must have plan(s) with achievable milestones for Health IT adoption for Medicaid service providers both eligible and ineligible for the Medicaid Electronic Health Records (EHR) Incentive Programs and execute upon the plan(s).

b)  The state shall create a pathway, or a plan, for the exchange of clinical health information related to Medicaid beneficiaries statewide to support the demonstration's program objectives.

c)  The state shall advance the standards identified in the "Interoperability Standards Advisory—Best Available Standards and Implementation Specifications" (ISA) in developing and implementing state policies—and in all applicable state procurements (e.g. including managed care contracts).

   i)  Wherever it is appropriate, the state must require that contractors providing services paid for by funds authorized under this demonstration shall adopt the standards referenced in 45 CFR Part 170. ii. Wherever services paid for by funds authorized by this demonstration are not addressed by 45 CFR Part 170, but are addressed by the ISA, the state should require that contractors providing such services adopt the appropriate ISA standard.

   ii)  States should use the CMS 1115 Health IT resources available on "Medicaid Program Alignment with State Systems to Advance HIT, HIE, and Interoperability" at https://www.medicaid.gov/medicaid/data-and- systems/hie/index.html.  Specifically, the state should utilize the "1115 Health IT Toolkit" for health IT considerations in conducting an assessment and developing their Health IT Strategic Plans.

d)  Based on the assessment described above, the state will provide a Health IT Strategic Plan that details existing HIT capabilities.  The Strategic Plan should also support the goals below -- and develop a mutually-agreed upon timeframe between CMS and the state for submitting the plan and any necessary enhancements. HHSC submitted the plan to CMS on March 31, 2020, and CMS approved the plan on May 11, 2020.  The plan shall remain in effect during this extension period, and HHSC shall update it as necessary to reflect state changes in priorities and operations.

   i)  When multiple Medicaid providers provide coordinated care to a beneficiary, the state shall require the legally appropriate electronic exchange of clinical health information, using the Consolidated Clinical Document Architecture (C-CDA), among appropriate members of the individual patient's interdisciplinary care team.

   ii)  The state shall ensure legally appropriate access to a comprehensive Medicaid enterprise master patient index that supports the programmatic objectives of the demonstration.

   iii)  The state shall ensure a comprehensive Medicaid service provider directory strategy that supports the programmatic objectives of the demonstration.

Complaint Exhibit 1, Page 56 of 86

iv) The state will pursue legally appropriate means of improved coordination and improved integration between Medicaid Behavioral Health, Physical Health, Home and Community Based Providers and community-level collaborators for Improved Care Coordination (as applicable) through the adoption of provider-level Health IT infrastructure and software—to facilitate and improve integration and coordination to support the programmatic objectives of the demonstration.

v) The State shall ensure a comprehensive Health IT-enabled quality measurement strategy that supports the legally appropriate collection of data necessary for the State to monitor and evaluate programmatic objectives of the demonstration, and the legally appropriate means of providing such data for demonstration monitoring and evaluation activities.

# VII. GENERAL FINANCIAL REQUIREMENTS

45) **Allowable Expenditures.**  This demonstration project is approved for expenditures applicable to services rendered during the demonstration approval period designated by CMS.  CMS will provide FFP for allowable demonstration expenditures only so long as they do not exceed the pre-defined limits as specified in these STCs.[5]

46) **Quarterly Expenditure Reports.** The state must provide quarterly title XIX expenditure reports using Form CMS-64, to separately report total expenditures for services provided through this demonstration under section 1115 authority that are subject to budget neutrality. This project is approved for expenditures applicable to services rendered during the demonstration period. CMS shall provide FFP for allowable demonstration expenditures, only as long as they do not exceed the pre-defined limits on the costs incurred, as specified in Section VIII.

The state shall provide quarterly title XXI expenditure reports using the Form CMS64.21U/CMS64.21UP to report total title XXI expenditures for services provided to M- CHIP children under the section 1115 authority until its XXI allotment is spent and then using the 64.9/64.9P Waiver form with waiver name of "THTQIP-M-CHIP," and "64.21U & 64.21UP THTQIP-Qualified".  CMS will provide Federal financial participation (FFP) for allowable Texas title XXI demonstration expenditures that do not exceed the state's available title XXI funding and then Federal participation at the enhanced rate under Title XIX once the state's Title XXI funding is fully exhausted.

47) **Expenditures Subject to the title XIX Budget Neutrality Expenditure Limit**.
a) All expenditures for Medicaid services for demonstration participants (as defined in STC 18 [Table 2], 19 [Table 3], and 28 [Table 5]) are demonstration expenditures subject to the budget neutrality expenditure limit, except expenditures for the services listed as follows:

i) Medicare premiums;
ii) Other 1915(c) waiver programs as follows: Medically Dependent Children Program (TX 0181), Deaf Blind with Multiple Disabilities (TX 0281), Home and Community- Based Services (TX 0110),

---

[5] For a description of CMS's current policies related to budget neutrality for Medicaid demonstration projects authorized under section 1115(a) of the Act, see State Medicaid Director Letter #18-009.

Community Living Assistance and Support Services (TX 0221), Texas Home Living (TX 0403), and Youth Empowerment Services (TX 0657).

b) All Funding Pool expenditures (as defined in Section V) are demonstration expenditures subject to the budget neutrality expenditure limit.

48) **Program Integrity.**  The state must have processes in place to ensure there is no duplication of federal funding for any aspect of the demonstration.  The state must also ensure that the state and any of its contractors follow standard program integrity principles and practices including retention of data.  All data, financial reporting, and sources of non-federal share are subject to audit.

49) **Medicaid Expenditure Groups.**  Medicaid Expenditure Groups (MEG) are defined for the purpose of identifying categories of Medicaid or demonstration expenditures subject to budget neutrality, components of budget neutrality expenditure limit calculations, and other purposes related to monitoring and tracking expenditures under the demonstration. The Master MEG Chart table provides a master list of MEGs defined for this demonstration.

**Table 8: Master MEG Chart**

| MEG | To Which BN Test Does This Apply? | WOW Per Capita | WOW Aggregate | WW | Brief Description |
|---|---|---|---|---|---|
| THTQIP-Adults | Main test | X | | X | Medical assistance expenditures for Adults |
| THTQIP-Children | Main test | X | | X | Medical assistance expenditures for Children |
| THTQIP-AMR | Main test | X | | X | Medical assistance expenditures for AMR |
| THTQIP-Disabled | Main test | X | | X | Medical assistance expenditures for Disabled |
| THTQIP 217-like AMR | Hypo1 | X | | X | Medical assistance expenditures for 217-Like AMR |
| THTQIP 217-like Disabled | Hypo1 | X | | X | Medical assistance expenditures for 217-Like Disabled |
| THTQIP-UC | Main test | | | X | See Expenditure Authority 5 |
| THTQIP – PHC-CCP | Main test | | | X | See Expenditure Authority 10 |
| THTQIP-DSRIP | Main test | | | X | See Expenditure Authority 6, 7 |
| 64.21U & 64.21UP THTQIP-Qualified | CHIP Allotment | | | X | Medical assistance expenditures for M-CHIP Children |
| THTQIP-M-CHIP | CHIP Allotment | | | X | Medical assistance expenditures for M-CHIP Children |
| UPL for Excluded Population | Main test | | X | | UPL diversionary spending amount for Excluded Population inpatient hospital |
| UPL for Included Population | Main test | | X | | UPL diversionary spending amount for Included Population inpatient hospital |

| Physician UPL | Main test | | X | | UPL diversionary spending amount Physician |
| Outpatient UPL | Main test | | X | | UPL diversionary spending amount for outpatient hospital |
| THTQIP-Admin | N/A | | | X | Additional administrative costs that are directly attributable to the demonstration |

50) **Reporting Expenditures and Member Months**.  The state must report all demonstration expenditures claimed under the authority of title XIX of the Act and subject to budget neutrality each quarter on separate forms CMS-64.9 WAIVER and/or 64.9P WAIVER, identified by the demonstration project number assigned by CMS 11-W-00278/6).  Separate reports must be submitted by MEG (identified by Waiver Name) and Demonstration Year (identified by the two digit project number extension).  Unless specified otherwise, expenditures must be reported by DY according to the dates of service associated with the expenditure.  All MEGs identified in the Master MEG Chart as WW must be reported for expenditures, as further detailed in the MEG Detail for Expenditure and Member Month Reporting table below.  To enable calculation of the budget neutrality expenditure limits, the state also must report member months of eligibility for specified MEGs.

   a)  Cost Settlements. The state will report any cost settlements attributable to the demonstration on the appropriate prior period adjustment schedules (form CMS-64.9P WAIVER) for the summary sheet line 10b, in lieu of lines 9 or 10c.  For any cost settlement not attributable to this demonstration, the adjustments should be reported as otherwise instructed in the State Medicaid Manual.  Cost settlements must be reported by DY consistent with how the original expenditures were reported.

   b)  Premiums and Cost Sharing Collected by the State.  The state will report any premium contributions collected by the state from demonstration enrollees quarterly on the form CMS-64 Summary Sheet line 9D, columns A and B.  In order to assure that these collections are properly credited to the demonstration, quarterly premium collections (both total computable and federal share) should also be reported separately by DY on form CMS-64 Narrative, and on the Total Adjustments tab in the Budget Neutrality Monitoring Tool.  In the annual calculation of expenditures subject to the budget neutrality expenditure limit, premiums collected in the demonstration year will be offset against expenditures incurred in the demonstration year for determination of the state's compliance with the budget neutrality limits.

   c)  Pharmacy Rebates. Because pharmacy rebates are not included in the base expenditures used to determine the budget neutrality expenditure limit, pharmacy rebates are not included for calculating net expenditures subject to budget neutrality. The state will report pharmacy rebates on form CMS-64.9 BASE, and not allocate them to any form 64.9 or 64.9P WAIVER.

   d)  Administrative Costs.  The state will separately track and report additional administrative costs that are directly attributable to the demonstration.  All administrative costs must be identified on the forms CMS-64.10 WAIVER and/or 64.10P WAIVER.  Unless indicated otherwise on the Master MEG Chart table, administrative costs are not counted in the budget neutrality tests; however, these costs are subject to monitoring by CMS.

   e)  Member Months.  As part of the Quarterly and Annual Reports described in section STC 74, the state must report the actual number of "eligible member months" for all demonstration enrollees for all MEGs identified as WOW Per Capita in the Master MEG Chart table above, and as also indicated in the MEG Detail for Expenditure and Member Month Reporting table below.  The term "eligible member months"

refers to the number of months in which persons enrolled in the demonstration are eligible to receive services.  For example, a person who is eligible for three months contributes three eligible member months to the total.  Two individuals who are eligible for two months, each contribute two eligible member months, for a total of four eligible member months.  The state must submit a statement accompanying the Annual Report certifying the accuracy of this information.

f)   Budget Neutrality Specifications Manual. The state will create and maintain a Budget Neutrality Specifications Manual that describes in detail how the state will compile data on actual expenditures related to budget neutrality, including methods used to extract and compile data from the state's Medicaid Management Information System, eligibility system, and accounting systems for reporting on the CMS-64, consistent with the terms of the demonstration.  The Budget Neutrality Specifications Manual will also describe how the state compiles counts of Medicaid member months.  The Budget Neutrality Specifications Manual must be made available to CMS on request.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 53 of 79

Complaint Exhibit 1, Page 60 of 86

## Table 9: MEG Detail for Expenditure and Member Month Reporting

| MEG (Waiver Name) | Detailed Description | Exclusions | CMS-64.9 Line(s) To Use | How Expend. Are Assigned to DY | MAP or ADM | Report Member Months (Y/N) | MEG Start Date | MEG End Date |
|---|---|---|---|---|---|---|---|---|
| THTQIP-Adults | Medicaid assistance expenditures for all participating individuals whose MEG is defined as Adults; | None | Follow CMS-64.9 Base Category of Service Definitions | Date of service | MAP | Y | 10/1/11 | 9/30/30 |
| THTQIP-Children | Medicaid assistance expenditures for all participating individuals whose MEG is defined as Children; | None | Follow CMS-64.9 Base Category of Service Definitions | Date of service | MAP | Y | 10/1/11 | 9/30/30 |
| THTQIP-AMR | Medicaid assistance expenditures for all participating individuals who are aged, or who are disabled and have Medicare | None | Follow CMS-64.9 Base Category of Service Definitions | Date of service | MAP | Y | 10/1/11 | 9/30/30 |

Compliant Exhibit 1, Page 61 of 86

| THTQIP-Disabled | Medicare assistance expenditures for all participating individuals who are disabled and do not have Medicare | None | Follow CMS-64.9 Base Category of Service Definitions | Date of service | MAP | Y | 10/1/11 | 9/30/30 |
| THTQIP 217-like AMR | Medical assistance expenditures for categorically needy individuals with Medicare receiving HCBS services (of the kind listed in Table 6) in the STAR+PLUS service areas, per Expenditure Authority 1. | None | Follow CMS-64.9 Base Category of Service Definitions | Date of service | MAP | Y | 10/1/11 | 9/30/30 |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023

Page 55 of 79

Complaint Exhibit 1, Page 62 of 86

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| THTQIP 217-like Disabled | Medical assistance expenditures for categorically needy individuals without Medicare receiving HCBS services (of the kind listed in Table 6) in the STAR+PLUS service areas, per Expenditure Authority 1 | None | Follow CMS-64.9 Base Category of Service Definitions | Date of service | MAP | Y | 10/1/11 | 9/30/30 |
| THTQIP-UC | All expenditures that count against UC Pool limits | None | Use Line 1C Inpatient Hospital - Sup. Payments, Line 5B Physician & Surgical Services - Sup. Payments, Line 8 Dental Services, or Line 49 Other Care Services | Date of payment | MAP | N | 10/1/11 | 9/30/30 |
| THTQIP – PHC-CCP | All expenditures that count against PHC-CCP Pool limits | None | | Date of payment | MAP | N | 10/1/20 | 9/30/30 |
| THTQIP-DSRIP | All DSRIP Pool expenditures. | None | Use Line 49 Other Care Services | Date of payment | MAP | N | 10/1/11 | 9/30/21 |
| 64.21U & 64.21UP THTQIP-Qualified | Medical assistance expenditures for all participating individuals whose MEG is defined as Qualified aliens. Title XXI expenditures for this group are | None | Follow CMS-64.21U Base Category of Service Definitions | Date of service | MAP | Y | 10/1/11 | 9/30/30 |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023

Page 56 of 79

Complaint Exhibit 1, Page 63 of 86

Case 4:23-cv-04799   Document 1-1   Filed 12/22/23 in TXSD   Page 65 of 87

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | excluded from budget neutrality but are counted against the Title XXI allotment as described in STC 56 below. | | | | | | | |
| THTQIP-M-CHIP | All medical assistance expenditures for children who are ages 6-18 and between 100-133% FPL, or children served in CHIP on December 31, 2013 due to assets in excess of Medicaid eligibility limits. These are children who meet the definition of "targeted low-income child" specified in section 2110 (b)(1) of the Social Security Act. Title XXI expenditures for this group are excluded from budget neutrality but are counted against the Title XXI allotment as described in paragraph (d) below. | None | Follow CMS-64.21U Base Category of Service Definitions | Date of service | MAP | Y | 10/1/11 | 9/30/30 |
| THTQIP-Admin | Additional administrative costs that are directly attributable to the demonstration | None | Follow CMS-64.10 Base Category Definitions | Date of payment | ADM | N | 10/1/11 | 9/30/30 |

Complaint Exhibit 1, Page 64 of 86

51) **Standard Medicaid and CHIP Funding Process**. The standard Medicaid funding process will be used for this demonstration.  The state will provide quarterly expenditure reports through the Medicaid and CHIP Budget and Expenditure System (MBES/CBES) to report total expenditures for services provided under this demonstration following routine CMS-37 and CMS-64 reporting instructions as outlined in section 2500 of the State Medicaid Manual.  The state will estimate matchable demonstration expenditures (total computable and federal share) subject to the budget neutrality expenditure limit and separately report these expenditures by quarter for each federal fiscal year on the form CMS-37 for both the medical assistance payments (MAP) and state and local administration costs (ADM).  CMS shall make federal funds available based upon the state's estimate, as approved by CMS.  Within thirty (30) days after the end of each quarter, the state shall submit form CMS-64 Quarterly Medicaid Expenditure Report, showing Medicaid expenditures made in the quarter just ended.  If applicable, subject to the payment deferral process, CMS shall reconcile expenditures reported on form CMS-64 with federal funding previously made available to the state, and include the reconciling adjustment in the finalization of the grant award to the state.

a)   The standard title XXI funding process will be used during the demonstration for M- CHIP children. The state must estimate matchable M-CHIP expenditures on the quarterly Form CMS-37. As a footnote to the CMS-37, the state shall provide updated estimates of expenditures for the M-CHIP children demonstration populations. CMS will make Federal funds available based upon the state's estimate, as approved by CMS. Within 30 days after the end of each quarter, the state must submit the Form CMS-64.21 U-Waiver quarterly CHIP expenditure report. CMS will reconcile expenditures reported on the Form CMS-64.21U-waiver with Federal funding previously made available to the state, and include the reconciling adjustment in the finalization of the grant award to the state.

52) **Extent of Federal Financial Participation for the Demonstration**. Subject to CMS approval of the source(s) of the non-federal share of funding (see STC 53, *Sources of Non- Federal Share*), CMS shall provide FFP at the applicable federal matching rates for the demonstration as a whole as outlined below, subject to the budget neutrality limits described in Section IX of these STCs:
a)   Administrative costs, including those associated with the administration of the demonstration;
b)   Net expenditures and prior period adjustments of the Medicaid program that are paid in accordance with the approved Medicaid state plan and waiver authorities;
c)   Net expenditures and prior period adjustments, made under approved Expenditure Authorities granted through section 1115(a)(2) of the Act, with dates of service during the operation of the demonstration;
d)   Net expenditures for Funding Pool payments.

53) **Sources of Non-Federal Share.** As a condition of demonstration approval, the state certifies that the non-federal share is obtained from permissible state and/or local funds that, unless permitted by law,

are not other federal funds.  The state further certifies that such funds must not be used as the match for any other Federal grant or contract, except as permitted by law.  CMS approval of this demonstration does not constitute direct or indirect approval of any underlying source of non-federal share or associated funding mechanisms and all sources of non-Federal funding must be compliant with Section 1903(w) of the Act and applicable regulations. In addition, CMS reserves the right to prohibit the use of any sources of non-federal share funding that it determines impermissible.

a) If requested, the state must submit for CMS review and approval documentation of any sources of non-federal share that would be used to fund the demonstration.

b) If requested, the state must submit for CMS review and approval documentation of any sources of non-federal share that would be used to fund the demonstration.

c) Without limitation, CMS may request information about the non-federal share sources for any amendments that CMS determines may financially impact the demonstration.

54) **Financial Integrity for Managed Care and Other Delivery Systems.**  As a condition of demonstration approval, the state attests to the following, as applicable:

a) All risk-based managed care organization, prepaid inpatient health plan (PIHP), and prepaid ambulatory health plan (PAHP) payments, comply with the requirements on payments in 42 CFR §438.6(b)(2), 438.6(c), 438.6(d), 438.60 and/or 438.74.

b) For non-risk-based PIHPs and PAHPs, arrangements comply with the upper payment limits specified in 42 CFR §447.362, and if payments exceed the cost of services, the state will recoup the excess and return the federal share of the excess to CMS.

55) **Claiming Period.** The state will report all claims for expenditures subject to the budget neutrality agreement (including any cost settlements) within two years after the calendar quarter in which the state made the expenditures.  All claims for services during the demonstration period (including any cost settlements) must be made within two years after the conclusion or termination of the demonstration.  During the latter two-year period, the state will continue to identify separately net expenditures related to dates of service during the operation of the demonstration on the CMS-64 waiver forms in order to properly account for these expenditures in determining budget neutrality.

56) **Budget Neutrality Monitoring Tool.**  The state must provide CMS with quarterly budget neutrality status updates, including established baseline and member months data, using the Budget Neutrality Monitoring Tool provided through the Performance Metrics Database and Analytics (PMDA) system.  The tool incorporates the "Schedule C Report" for comparing demonstration's actual expenditures to the budget neutrality expenditure limits described in section XI.  CMS will provide technical assistance, upon request.

57) **Future Adjustments to Budget Neutrality.**  CMS reserves the right to adjust the budget neutrality expenditure limit:

a) To be consistent with enforcement of laws and policy statements, including regulations and letters, regarding impermissible provider payments, health care related taxes, or other payments, CMS reserves the right to make adjustments to the budget neutrality limit if any health care related tax that was in effect

Complaint Exhibit 1, Page 66 of 86

during the base year, or provider-related donation that occurred during the base year, is determined by CMS to be in violation of the provider donation and health care related tax provisions of section 1903(w) of the Act. Adjustments to annual budget targets will reflect the phase out of impermissible provider payments by law or regulation, where applicable.

b) To the extent that a change in federal law, regulation, or policy requires either a reduction or an increase in FFP for expenditures made under this demonstration. In this circumstance, the state must adopt, subject to CMS approval, a modified budget neutrality agreement as necessary to comply with such change. The modified agreement will be effective upon the implementation of the change. The trend rates for the budget neutrality agreement are not subject to change under this STC. The state agrees that if mandated changes in the federal law require state legislation, the changes shall take effect on the day such state legislation becomes effective, or on the last day such legislation was required to be in effect under the federal law.

c) The state certifies that the data it provided to establish the budget neutrality expenditure limit are accurate based on the state's accounting of recorded historical expenditures or the next best available data, that the data are allowable in accordance with applicable federal, state, and local statutes, regulations, and policies, and that the data are correct to the best of the state's knowledge and belief. The data supplied by the state to set the budget neutrality expenditure limit are subject to review and audit, and if found to be inaccurate, will result in a modified budget neutrality expenditure limit.

**58) Demonstration Year Definitions.** Demonstration Years are defined in the following table.

**Table 10: Demonstration Year Definitions**

| Demonstration Year | Start Date | End Date |
|---|---|---|
| DY 1 | December 12, 2011* | September 30, 2012 |
| DY 2 | October 1, 2012 | September 30, 2013 |
| DY 3 | October 1, 2013 | September 30, 2014 |
| DY 4 | October 1, 2014 | September 30, 2015 |
| DY 5 | October 1, 2015 | September 30, 2016 |
| DY 6 | October 1, 2016 | September 30, 2017 |
| DY 7 | October 1, 2017 | September 30, 2018 |
| DY 8 | October 1, 2018 | September 30, 2019 |
| DY 9 | October 1, 2019 | September 30, 2020 |
| DY 10 | October 1, 2020 | September 30, 2021 |
| DY 11 | October 1, 2021 | September 30, 2022 ** |
| DY 12 | October 1, 2022 | September 30, 2023 |
| DY 13 | October 1, 2023 | September 30, 2024 |
| DY 14 | October 1, 2024 | September 30, 2025 |

Complaint Exhibit 1, Page 67 of 86

| Demonstration Year | Start Date | End Date |
|---|---|---|
| DY 15 | October 1, 2025 | September 30, 2026 |
| DY 16 | October 1, 2026 | September 30, 2027 |
| DY 17 | October 1, 2027 | September 30, 2028 |
| DY 18 | October 1, 2028 | September 30, 2029 |
| DY 19 | October 1, 2029 | September 30, 2030 |

* For purpose of expenditure reporting and budget neutrality, DY 1 begins October 1, 2011.

**Original end date to the December 21, 2017 extension approval.

# VIII. MONITORING BUDGET NEUTRALITY FOR THE DEMONSTRATION

59) **Limit on Title XIX and XXI Funding.**

a) The state will be subject to limits on the amount of federal Medicaid funding the state may receive over the course of the demonstration approval. The budget neutrality expenditure limits are based on projections of the amount of FFP that the state would likely have received in the absence of the demonstration. The limit may consist of a Main Budget Neutrality Test, and one or more Hypothetical Budget Neutrality Tests, as described below. CMS's assessment of the state's compliance with these tests will be based on the Schedule C CMS-64 Waiver Expenditure Report, which summarizes the expenditures reported by the state on the CMS-64 that pertain to the demonstration.

b) The state will be subject to a limit on the amount of federal title XXI funding that the state may receive on demonstration expenditures for M-CHIP children during the demonstration period. Federal title XXI funding available for demonstration expenditures for M-CHIP children is limited to the state's available allotment, including currently available reallocated funds and contingency funds. Should the state expend its available title XXI Federal funds for the claiming period, no further enhanced title XXI Federal matching funds will be available for costs of the approved title XXI child health program or demonstration until the next allotment becomes available.

   i) <u>Exhaustion of title XXI Funds.</u> After the State has exhausted title XXI funds, expenditures for M-CHIP children, may be claimed as title XIX expenditures. The State shall report expenditures for these children as waiver expenditures on the Forms CMS 64.9 Waiver and/or CMS 64.9P Waiver in accordance with STC 42.

   ii) <u>Exhaustion of title XXI Funds Notification.</u> The State must notify CMS in writing of any anticipated title XXI shortfall at least 120 days prior to an expected change in claiming of expenditures for the M-CHIP children. The State must follow Medicaid State plan criteria for these beneficiaries unless specific waiver and expenditure authorities are granted through this demonstration.

60) **Risk.** The budget neutrality expenditure limits are determined on either a per capita or aggregate basis. If a per capita method is used, the state is at risk for the per capita cost of state plan and hypothetical populations, but not for the number of participants in the demonstration population. By providing FFP without regard to enrollment in the demonstration for all demonstration populations, CMS will not place the state at risk for

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 61 of 79

Complaint Exhibit 1, Page 68 of 86

changing economic conditions; however, by placing the state at risk for the per capita costs of the demonstration populations, CMS assures that the demonstration expenditures do not exceed the levels that would have been realized had there been no demonstration. If an aggregate method is used, the state accepts risk for both enrollment and per capita costs.

61) **Calculation of the Budget Neutrality Limits and How They Are Applied.** To calculate the budget neutrality limits for the demonstration, separate annual budget limits are determined for each DY on a total computable basis. Each annual budget limit is the sum of one or more components: per capita components, which are calculated as a projected without-waiver PMPM cost times the corresponding actual number of member months, and aggregate components, which project fixed total computable dollar expenditure amounts.  The annual limits for all DYs are then added together to obtain a budget neutrality limit for the entire demonstration period.  The federal share of this limit will represent the maximum amount of FFP that the state may receive during the demonstration period for the types of demonstration expenditures described below.  The federal share will be calculated by multiplying the total computable budget neutrality expenditure limit by the appropriate Composite Federal Share.

62) **Main Budget Neutrality Test**.  The Main Budget Neutrality Test allows the state to show that demonstration waivers granted have not resulted in increased costs to Medicaid, and that federal Medicaid "savings" have been achieved sufficient to offset the additional projected federal costs resulting from expenditure authority. The table below identifies the MEGs that are used for the Main Budget Neutrality Test.  MEGs designated as "WOW Only" or "Both" are components used to calculate the budget neutrality expenditure limit. MEGs that are indicated as "WW Only" or "Both" are counted as expenditures against the budget neutrality expenditure limit. In addition, any expenditures in excess of the limit from Hypothetical Budget Neutrality Tests count as expenditures under the Main Budget Neutrality Test. The Composite Federal Share for this test is calculated based on all MEGs indicated as "Both."

   a) **Mechanics and Data for Rebasing the WOW PMPMs.**  CMS and Texas will rebase budget neutrality PMPM that will be effective in DY12 (October 1, 2022-September 30, 2023) using DY11 (October 1, 2021-September 30, 2022) data to establish the rebased without-waiver (WOW) PMPMs for use beginning in DY12.  To calculate the new rebased amount the budget neutrality will be adjusted so that budget neutrality accounts for annualized amounts of CMS-approved state directed payments (pending state legislative approval) expenditures made in DY11.  In response to the Public Health Emergency, CMS will allow for a one-time adjustment to budget neutrality to account for impacts of COVID-19 on enrollment and expenditures.

   b) The combined state directed payment adjustments to the DY12 budget neutrality PMPMs may not exceed $2,917,000,000.

   c) The state directed payment adjustments to the WOW PMPM for DY 12 will be calculated as follows:

      i) Excluding all costs not otherwise matchable (e.g. STC 39 and 41. Hospital uncompensated charity care and Public Health Providers Charity Care Pool (PHP-CCP) expenditures) from the adjustment, the total of state directed payment adjustments will be equal to the total amount of state directed payments approved by CMS during DY 11, minus all actual state directed payment expenditures made for DY 11.  The DY12 WOW PMPMs will be adjusted to include the total of state directed payment adjustments, using an allocation formula approved by CMS.  If a request for approval pursuant to 42 CFR 438.6(c) is required, requests for DY11 must be submitted to CMS for review by

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                              Page 62 of 79

the state in accordance with STC 31.  Only state directed payment programs that obtain CMS approval will be included in the adjustments described under this subparapgraph.

ii) The trend factor for the state will be calculated as the lesser of the president's budget trend or the state's actual trend from DY7 to DY11, based on total MEG expenditures including directed payment programs or state plan amendments.

iii) The trend factor described in subparagraph (ii) of this paragraph will be applied beginning with the DY11 data for rebased PMPMs in DY12 through DY19.

iv) The state will also be authorized to rollover any savings accrued by the state during DY5 through DY9, as they are the five years immediately preceding the extension creating the new demonstration period of DY10 through DY19.

v) Attachment U includes estimated PMPMs Texas.  This attachment is for information purposes only. Once the new WOW PMPMs are calculated for DY 12 using DY 11 actual expenditures, table 11 will be updated to reflect those numbers.

vi) Due to the 10 year renewal, a second round of rebasing with actuals will occur for DY17 (October 1, 2027-September 30, 2028) using DY15 (October 1, 2025-September 30, 2026) as the base.

vii) The state will also be authorized to rollover any savings accrued by the state in each demonstration year starting with DY12 through DY16, as those are the five fiscal years immediately preceding the rebasing that will occur for DY17.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 63 of 79

Complaint Exhibit 1, Page 70 of 86

**Table 11 – Main Budget Neutrality Test**

| MEG | PC or Agg* | WOW Only, WW Only, or Both | Trend | DY 10 | DY 11 |
|---|---|---|---|---|---|
| THTQIP-AMR | PC | Both | 3.8% | $1,406.89 | $1,470.31 |
| THTQIP-Disabled | PC | Both | 4.1% | 1,946.81 | $2,124.51 |
| THTQIP-Adults | PC | Both | 5.3% | $1,198.18 | $1,560.53 |
| THTQIP-Children | PC | Both | 4.5% | $396.52 | $450.00 |
| THTQIP-UC | Agg | WW only | N/A | N/A | N/A |
| THTQIP – PHC-CCP | Agg | WW only | N/A | N/A | N/A |
| THTQIP-DSRIP | Agg | WW only | N/A | N/A | N/A |
| UPL for Included Population | Agg | WOW only | 0% | $2,346,880,705 | $2,346,880,705 |
| UPL for Excluded Population | Agg | WOW only | 0% | $1,681,649,843 | $1,681,649,843 |
| Physician UPL | Agg | WOW only | 0% | $72,483,206 | $72,483,206 |
| Outpatient UPL | Agg | WOW only | 0% | $84,237,473 | $84,237,473 |

Complaint Exhibit 1, Page 71 of 86

**Table 11 – Main Budget Neutrality Test (cont.)**

| MEG | PC or Agg* | WOW Only, WW Only, or Both | Trend | DY 12 | DY 13 | DY 14 | DY 15 | DY 16 |
|---|---|---|---|---|---|---|---|---|
| THTQIP-AMR | PC | Both | TBD | TBD | TBD | TBD | TBD | TBD |
| THTQIP-Disabled | PC | Both | TBD | TBD | TBD | TBD | TBD | TBD |
| THTQIP-Adults | PC | Both | TBD | TBD | TBD | TBD | TBD | TBD |
| THTQIP-Children | PC | Both | TBD | TBD | TBD | TBD | TBD | TBD |
| THTQIP-UC | Agg | WW only | N/A | N/A | N/A | N/A | N/A | N/A |
| THTQIP – PHC-CCP | Agg | WW only | N/A | N/A | N/A | N/A | N/A | N/A |
| THTQIP-DSRIP | Agg | WW only | N/A | N/A | N/A | N/A | N/A | N/A |
| UPL for Included Population | Agg | WOW only | 0% | $2,346,880,705 | $2,346,880,705 | $2,346,880,705 | $2,346,880,705 | $2,346,880,705 |
| UPL for Excluded Population | Agg | WOW only | 0% | $1,681,649,843 | $1,681,649,843 | $1,681,649,843 | $1,681,649,843 | $1,681,649,843 |
| Physician UPL | Agg | WOW only | 0% | $72,483,206 | $72,483,206 | $72,483,206 | $72,483,206 | $72,483,206 |
| Outpatient UPL | Agg | WOW only | 0% | $84,237,473 | $84,237,473 | $84,237,473 | $84,237,473 | $84,237,473 |

**Table 11 – Main Budget Neutrality Test (cont.)**

| MEG | PC or Agg* | WOW Only, WW Only, or Both | Trend | DY 17 | DY 18 | DY 19 |
|---|---|---|---|---|---|---|
| THTQIP-AMR | PC | Both | TBD | TBD | TBD | TBD |
| THTQIP-Disabled | PC | Both | TBD | TBD | TBD | TBD |
| THTQIP-Adults | PC | Both | TBD | TBD | TBD | TBD |
| THTQIP-Children | PC | Both | TBD | TBD | TBD | TBD |
| THTQIP-UC | Agg | WW only | N/A | N/A | N/A | N/A |
| THTQIP – PHC-CCP | Agg | WW only | N/A | N/A | N/A | N/A |
| THTQIP-DSRIP | Agg | WW only | N/A | N/A | N/A | N/A |
| UPL for Included Population | Agg | WOW only | 0% | $2,346,880,705 | $2,346,880,705 | $2,346,880,705 |
| UPL for Excluded Population | Agg | WOW only | 0% | $1,681,649,843 | $1,681,649,843 | $1,681,649,843 |
| Physician UPL | Agg | WOW only | 0% | $72,483,206 | $72,483,206 | $72,483,206 |
| Outpatient UPL | Agg | WOW only | 0% | $84,237,473 | $84,237,473 | $84,237,473 |

63) **Hypothetical Budget Neutrality.** When expenditure authority is provided for coverage of populations or services that the state could have otherwise provided through its Medicaid state plan or other title XIX authority (such as a waiver under section 1915 of the Act), CMS considers these expenditures to be "hypothetical;" that is, the expenditures would have been eligible to receive FFP elsewhere in the Medicaid program. For these hypothetical expenditures, CMS makes adjustments to the budget neutrality test which effectively treats these expenditures as if they were for approved Medicaid state plan services. Hypothetical expenditures, therefore, do not necessitate savings to offset the otherwise allowable services. This approach reflects CMS's current view that states should not have to "pay for," with demonstration savings, costs that could have been otherwise eligible for FFP under a Medicaid state plan or other title XIX authority; however, when evaluating budget neutrality, CMS does not offset non-hypothetical expenditures with projected or

accrued savings from hypothetical expenditures.  That is, savings are not generated from a hypothetical population or service.  To allow for hypothetical expenditures, while preventing them from resulting in savings, CMS currently applies a separate, independent Hypothetical Budget Neutrality Tests, which subject hypothetical expenditures to pre-determined limits to which the state and CMS agree, and that CMS approves, as a part of this demonstration approval.  If the state's WW hypothetical spending exceeds the supplemental test's expenditure limit, the state agrees (as a condition of CMS approval) to offset that excess spending by savings elsewhere in the demonstration or to refund the FFP to CMS.

**Table 12 – Hypothetical Budget Neutrality Test**

| MEG | PC or Agg* | WOW Only, WW Only, or Both | TREND | DY 10 | DY 11 |
|---|---|---|---|---|---|
| 217-like AMR | PC | Both | 3.8% | $3,077.87 | $3,194.83 |
| 217-like Disabled | PC | Both | 4.1% | $5,138.52 | $5,349.20 |

| MEG | PC or Agg* | WOW Only, WW Only, or Both | TREND | DY 12 | DY 13 | DY 14 | DY 15 | DY 16 |
|---|---|---|---|---|---|---|---|---|
| 217-like AMR | PC | Both | TBD | TBD | TBD | TBD | TBD | TBD |
| 217-like Disabled | PC | Both | TBD | TBD | TBD | TBD | TBD | TBD |

| MEG | PC or Agg* | WOW Only, WW Only, or Both | TREND | DY 17 | DY 18 | DY 19 |
|---|---|---|---|---|---|---|
| 217-like AMR | PC | Both | TBD | TBD | TBD | TBD |
| 217-like Disabled | PC | Both | TBD | TBD | TBD | TBD |

64) **Composite Federal Share.**  The Composite Federal Share is the ratio that will be used to convert the total computable budget neutrality limit to federal share.  The Composite Federal Share is the ratio calculated by dividing the sum total of FFP received by the state on actual demonstration expenditures during the approval period by total computable demonstration expenditures for the same period, as reported through MBES/CBES and summarized on Schedule C.  Since the actual final Composite Federal Share will not be known until the end of the demonstration's approval period, for the purpose of interim monitoring of budget neutrality, a reasonable estimate of Composite Federal Share may be developed and used through the same process or through an alternative mutually agreed to method.  Each Main or Hypothetical Budget Neutrality Test has its own Composite Federal Share, as defined in the paragraph pertaining to each particular test.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 67 of 79

Complaint Exhibit 1, Page 74 of 86

65) **Transitional Phase-Down of Newly Accrued Savings.**  Beginning with DY 7, the net variance between the without-waiver cost and actual with-waiver cost will be reduced for selected Medical population based MEGs.  The reduced variance, calculated as an applicable percentage times the total variance, will be used in place of the total variance to determine overall budget neutrality for the demonstration.  (Equivalently, the difference between the total variance and reduced variance could be subtracted from the without-waiver cost estimate.)  The applicable percentages have been determined in accordance with the policy for Transitional Phase-Down of Newly Accrued Savings described in State Medicaid Director Letter # 18-009. This provision only applies to the Main Budget Neutrality Test, and to the MEGs that are designated "Both" without-waiver and with-waiver.  The MEGs affected by this provision and the applicable percentages are shown in the table below.  If the total variance for an MEG in a DY is negative, the applicable percentage is 100 percent.  The savings phase down ends when the budget neutrality calculation is rebased.  For Texas, the savings phase down ends September 30, 2022 (DY 11).

**Table 13 – Savings Phase-Out**

| MEG | DY 10 | DY 11 |
|---|---|---|
| AMR | 68% | 60% |
| Disabled | 69% | 61% |
| Adults | 41% | 37% |
| Children | 43% | 38% |

66) **Exceeding Budget Neutrality**.  CMS shall enforce budget neutrality over the life of the demonstration extension, which extends from DY 10 through DY 19.  The budget neutrality test for the demonstration extension may incorporate net savings from the immediately prior demonstration period of DY 5 through DY 9 (but not from any earlier approval period). If at the end of the demonstration approval period the budget neutrality limit has been exceeded, the excess federal funds will be returned to CMS.  If the demonstration is terminated prior to the end of the demonstration period, the budget neutrality test will be based on the time period through the termination date.

67) **Corrective Action Plan**. If at any time during the demonstration approval period CMS determines that the demonstration is on course to exceed its budget neutrality expenditure limit, CMS will require the state to submit a corrective action plan for CMS review and approval. CMS will use the threshold levels in the tables below as a guide for determining when corrective action is required.

**Table 14 Main Budget Neutrality Test**

| DY | Cumulative Target Definition | Percentage |
|---|---|---|
| DY 10 | Cumulative budget neutrality cap plus: | 1 percent |
| DY 11 | Cumulative budget neutrality cap plus: | 0.9 percent |
| DY 12 | Cumulative budget neutrality cap plus: | 0.8 percent |

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 68 of 79

Complaint Exhibit 1, Page 75 of 86

| DY | Cumulative Target Definition | Percentage |
|---|---|---|
| DY 13 | Cumulative budget neutrality cap plus: | 0.7 percent |
| DY 14 | Cumulative budget neutrality cap plus: | 0.6 percent |
| DY 15 | Cumulative budget neutrality cap plus: | 0.5 percent |
| DY 16 | Cumulative budget neutrality cap plus: | 0.4 percent |
| DY 17 | Cumulative budget neutrality cap plus: | 0.3 percent |
| DY 18 | Cumulative budget neutrality cap plus: | 0.2 percent |
| DY 19 | Cumulative budget neutrality cap plus: | 0.0 percent |

\* The percentage will be established at 0 percent upon rebasing in DY 17

**68) 1115A Duals Demo Savings.** When Texas' section 1115(a) demonstration is considered for an amendment, renewal, and at the end of the duals demonstration, CMS' Office of the Actuary (OACT) will estimate and certify actual title XIX savings to date under the duals demonstration attributable to populations and services provided under the 1115(a) demonstration.  This amount will be subtracted from the 1115(a) budget neutrality savings approved for the renewal.

Specifically, OACT will estimate and certify actual title XIX savings attributable to populations and services provided under the 1115(a) demonstration following the methodology below.

The actual title XIX savings attributable to populations and services provided under the 1115(a) demonstration are equal to the savings percentage specified in the 1115A duals demonstration MOU multiplied by the 1115A demonstration capitation rate and the number of 1115A duals demonstration beneficiaries enrolled in the 1115(a) demonstration.  1115A Demonstration capitation rate is reviewed by CMS's Medicare and Medicaid Coordination Office (MPLAN), MPLAN's contracted actuaries and CMS' Office of the Actuary (OACT), and was certified by the state's actuaries.  Per the 1115A duals demonstration MOU, the actual Medicaid rate paid for beneficiaries enrolled in the 1115A demonstration is equivalent to the state's 1115A Medicaid capitation rate minus an established savings percentage (as outlined in the chart below).  The state must track the number of member months for every Medicare-Medicaid enrollee (MME) who participates in both the 1115(a) and 1115A demonstration.

The table below provides an illustrative example of how the savings attributable to populations and services provided under the 1115(a) demonstration is calculated.

| | | C. | | E. | F. |
|---|---|---|---|---|---|
| **Table 15: MME Savings Calculation** | | | | | |
| **A.**<br>**1115A**<br>**Demonstration**<br>**Year** | **B.**<br>**Medicaid**<br>**Capitation Rate**<br>**(hypothetical)** | **Medicaid**<br>**Savings**<br>**Percentage**<br>**Applied Per**<br>**MOU**<br>**(average)** | **D.**<br>**Savings Per**<br>**Month (B\*C)** | **Member Months**<br>**of MMEs who**<br>**participated in**<br>**1115A and**<br>**1115(a) Demos**<br>**(estimated)** | **Amount**<br>**subtracted from**<br>**1115(a) BN**<br>**savings/ margin**<br>**(D\*E)** |
| **DY 1** | $1,000 PMPM | 1% | $10 PMPM | 1,000 | 1,000\* $10 PMPM = $10,000 |
| **DY 2** | $1,000 PMPM | 2% | $20 PMPM | 1,000 | 1,000 \* $20 PMPM = $20,000 |
| **DY 3** | $1,000 PMPM | 4% | $40 PMPM | 1,000 | 1,000 \* 40 PMPM = $40,000 |

In each Quarterly Report, the state must provide the information in the above-named chart (replacing estimated figures with actual data). Should rates differ by geographic area and/or rating category within the 1115A demonstration, this table should be done for each geographic area and/or rating category. In addition, the state must show the "amount subtracted from the 1115(a) BN savings" in the updated budget neutrality Excel worksheets that are submitted in each Quarterly Report.

a) Finally, in each quarterly CMS-64 submission and in each Quarterly Report, the state must indicate in the notes section: "For purposes of 1115(a) demonstration budget neutrality reporting purposes, the state reports the following information:

b) Number of Medicare-Medicaid enrollees served under the 1115 duals demonstration = [Insert number]

c) Number of member months = [Insert number]

d) PMPM savings per dual beneficiary enrolled from the 1115A duals demonstration = [Insert number]

The State must make the necessary retroactive adjustments to the budget neutrality worksheets to reflect modifications to the rates paid in the 1115A demonstration. This must include any Medicaid payment triggered by the risk corridor, IGTs, or other retroactive adjustments. The State must add additional columns to the chart above in subsequent Quarterly Reporting to reflect those adjustments.

69) **Exceeding Budget Neutrality after second rebasing**. CMS will enforce the budget neutrality agreement over the life of the demonstration approval period, which extends from 2020 to 2030. For the second rebasing of this demonstration in DY17 , the budget neutrality test may incorporate net savings from the immediately prior demonstration period of DY12 through DY16. If at the end of the demonstration approval period the budget neutrality limit has been exceeded, the excess federal funds will be returned to CMS. If the demonstration is terminated prior to the end of the demonstration period, the budget neutrality test will be based on the time period through the termination date.

70) **Withholding of Payment of Claims Under the Uncompensated Care Expenditure Authority Based on Failure to Submit Uncompensated Care Pool Reconciliations.** Texas must submit to CMS final

Complaint Exhibit 1, Page 77 of 86

reconciliations of all uncompensated care pools payments across both the hospital uncompensated care pool as well as the one for public healthcare providers (e.g., identify all overpayments) for each period of the renewal by January 31, of the following year after the Demonstration year (DY) has expired.  For example, if DYXX ends September 30, 20XX, the reconciliation is due to CMS no later than January 31 of the new DY. If the final reconciliation is not submitted by January 31, during the quarterly review of Medicaid expenditures, CMS will make a retroactive deferral adjustment to the State's DY expenditure authority for the current pool by one percent for non-compliance with the final reconciliation requirement for failure to adequately document uncompensated care pool claims through reconciliation of claimed payments with allowable payments.  If the final reconciliation has not been submitted within six months of initiation of the withhold, CMS will further reduce the pool expenditure authority by one percent for and will offset any amount claimed in excess of the resulting expenditure authority from the grant award for the following quarter of calendar year.

Texas must also credit the federal government with a share of any provider overpayments that are found in the course of reconciliations in accordance with the requirements of 42 CFR Part 433, Subpart F, or redistribute them as authorized elsewhere in these STCs.  Under those regulations, a refund of the Federal share of an overpayment must be made to CMS within one year after the date on which an overpayment is discovered or, if earlier, the date the provider refunded the overpayment.  The date of discovery will be the earlier of the date that: the reconciliation is finalized; the provider was notified in writing of the overpayment or acknowledged the overpayment; or the state initiated a formal recoupment action.

For all claims, pool payments, etc. that are subject to recoupment, redistribution, and or settlement, and the reconciliation is due to CMS no later than January 31 of each year for the prior Demonstration year, all recoupments and redistributions must be finalized within the regulatory time frame for timely payments found at 45 C.F.R. 95, Subpart F.  Any claims for prior demonstration years that exceed the requirement will not be accepted for federal funds participation unless the claim meets the requirement outlined in the regulation. Furthermore, when a claim for a prior DY is made, the claim must be made and attributed to the Federal Medical Assistance Percentage (FMAP) of the DY for all provider types, including private, public, and governmental.

Deliverables under this section will not be subject to the deferral indicated in STC 71, but solely the deferrals denoted in this STC.

# IX. GENERAL REPORTING REQUIREMENTS

71) **Deferral for Failure to Submit Timely Demonstration Deliverables.**  CMS may issue deferrals in accordance with 42 CFR part 430 subpart C, in the amount of $5,000,000 per deliverable (federal share) when items required by these STCs (e.g., required data elements, analyses, reports, design documents, presentations, and other items specified in these STCs (hereafter singularly or collectively referred to as "deliverable(s)") are not submitted timely to CMS or are found to not be consistent with the requirements approved by CMS. A deferral shall not exceed the value of the federal amount for the demonstration paid

Complaint Exhibit 1, Page 78 of 86

under section 1115(a)(2).  The state does not relinquish its rights provided under 42 CFR part 430 subpart C to challenge any CMS finding that the state materially failed to comply with the terms of this agreement.

The following process will be used: 1) Thirty (30) days after the deliverable was due, if the state has not submitted a written request to CMS for approval of an extension as described in subsection (b) below; or 2) Thirty days after CMS has notified the state in writing that the deliverable was not accepted for being inconsistent with the requirements of this agreement and the information needed to bring the deliverable into alignment with CMS requirements:

a)  CMS will issue a written notification to the state providing advance notification of a pending deferral for late or non-compliant submissions of required deliverable(s).

b)   For each deliverable, the state may submit to CMS a written request for an extension to submit the required deliverable that includes a supporting rationale for the cause(s) of the delay and the state's anticipated date of submission. Should CMS agree to the state's request, a corresponding extension of the deferral process can be provided. CMS may agree to a corrective action as an interim step before applying the deferral, if corrective action is proposed in the state's written extension request.

c)  If CMS agrees to an interim corrective process in accordance with subsection (b), and the state fails to comply with the corrective action steps or still fails to submit the overdue deliverable(s) that meets the terms of this agreement, CMS may proceed with the issuance of a deferral against the next Quarterly Statement of Expenditures reported in Medicaid Budget and Expenditure System/State Children's Health Insurance Program Budget and Expenditure System (MBES/CBES) following a written deferral notification to the state

d)  If the CMS deferral process has been initiated for state non-compliance with the terms of this agreement for submitting deliverable(s), and the state submits the overdue deliverable(s), and such deliverable(s) are accepted by CMS as meeting the standards outlined in these STCs, the deferral(s) will be released.

e)  As the purpose of a section 1115 demonstration is to test new methods of operation or service delivery, a state's failure to submit all required reports, evaluations, and other deliverables will be considered by CMS in reviewing any application for an extension, amendment, or for a new demonstration.

72) **Submission of Post-approval Deliverables.**  The state must submit all deliverables as stipulated by CMS and within the timeframes outlined within these STCs.

73) **Compliance with Federal Systems Updates.**  As federal systems continue to evolve and incorporate additional 1115 waiver reporting and analytics functions, the state will work with CMS to:
a)  Revise the reporting templates and submission processes to accommodate timely compliance with the requirements of the new systems;
b)  Ensure all 1115, T-MSIS, and other data elements that have been agreed to for reporting and analytics are provided by the state; and
c)  Submit deliverables to the appropriate system as directed by CMS.

74) **Monitoring Reports.** The state must submit three (3) Quarterly Monitoring Reports and one (1) Annual Monitoring Report each DY. The fourth quarter information that would ordinarily be provided in a separate monitoring report should be reported as distinct information within the Annual Monitoring Report. The Quarterly Monitoring Reports are due no later than sixty (60) calendar days following the end of each demonstration quarter. The Annual Monitoring Report (including the fourth-quarter information) is due no later than ninety (90) calendar days following the end of the DY. The monitoring reports will include all required elements as per 42 CFR 431.428, and should not direct readers to links outside the monitoring report. Additional links not referenced in the document may be listed in a Reference/Bibliography section. The monitoring reports must follow the framework provided by CMS, which is subject to change as monitoring systems are developed/evolved, and be provided in a structured manner that supports federal tracking and analysis.

   a) Operational Updates - Per 42 CFR 431.428, the Monitoring Reports must document any policy or administrative difficulties in operating the demonstration. The reports shall provide sufficient information to document key challenges, underlying causes of challenges, how challenges are being addressed, as well as key achievements and to what conditions and efforts successes can be attributed. The discussion should also include any issues or complaints identified by beneficiaries; lawsuits or legal actions; unusual or unanticipated trends; legislative updates; and descriptions of any public forums held. The Monitoring Report should also include a summary of all public comments received through post-award public forums regarding the progress of the demonstration.

   b) Performance Metrics – The performance metrics will provide data to demonstrate how the state is progressing towards meeting the demonstration's goals, and will cover key policies under this demonstration, including but not limited to, Medicaid Managed Care (e.g., trends related to the provider network and network adequacy to ensure MCO's meet service delivery area time/distance standards, and trends related to enrollment in STAR, STAR KIDS, STAR+PLUS, Dental Program, and Members with Special Health Care Needs), and Uncompensated Care (UC) (e.g., providers reporting UC costs). Per 42 CFR 431.428, the Monitoring Reports must document the impact of the demonstration in providing insurance coverage to beneficiaries and the uninsured population, as well as outcomes of care, quality and cost of care, and access to care. This may also include the results of beneficiary satisfaction surveys, if conducted, and grievances and appeals. The required monitoring and performance metrics must be included in the Monitoring Reports, and will follow the framework provided by CMS to support federal tracking and analysis.

   c) Budget Neutrality and Financial Reporting Requirements – Per 42 CFR 431.428, the Monitoring Reports must document the financial performance of the demonstration. The state must provide an updated budget neutrality workbook with every Monitoring Report that meets all the reporting requirements for monitoring budget neutrality set forth in the General Financial Requirements section of these STCs, including the submission of corrected budget neutrality data upon request. In addition, the state must report quarterly and annual expenditures associated with the populations affected by this demonstration on the Form CMS-64. Administrative costs for this demonstration should be reported separately on the CMS-64.

   d) Evaluation Activities and Interim Findings. Per 42 CFR 431.428, the Monitoring Reports must document any results of the demonstration to date per the evaluation hypotheses. The state shall include a summary

of the progress of evaluation activities, including key milestones accomplished, as well as challenges encountered and how they were addressed.

75)  **HCBS Quality Assurance Report.**  For HCBS, the state will submit a report to CMS which includes evidence on the status of the HCBS quality assurances and measures that adheres to the requirements outlined in the March 12, 2014, CMS Informational Bulletin, Modifications to Quality Measures and Reporting in §1915(c) Home and Community-Based Waivers.  The state must report annually the deficiencies found during the monitoring and evaluation of the HCBS demonstration assurances, an explanation of how these deficiencies have been or are being corrected, as well as the steps that have been taken to ensure that these deficiencies do not reoccur.  The state must also report on the number of substantiated instances of abuse, neglect, exploitation and/or death, the actions taken regarding the incidents and how they were resolved.  Submission is due no later than 6 months following the end of the demonstration year.

76) **Corrective Action Plan Related to Monitoring.**  If monitoring indicates that demonstration features are not likely to assist in promoting the objectives of Medicaid, CMS reserves the right to require the state to submit a corrective action plan to CMS for approval.  A state corrective action plan could include a temporary suspension of implementation of demonstration programs, in circumstances where monitoring indicates substantial and sustained directional change inconsistent with state's demonstration goals (such as substantial and sustained trends indicating increased difficulty accessing services).  A corrective action plan may be an interim step to withdrawing waivers or expenditure authorities, as outlined in Section III STC 10.  CMS will withdraw an authority, as described in Section III STC 10 when metrics indicate substantial and sustained directional change inconsistent with state's demonstration goals and the state has not implemented corrective action.  CMS would further have the ability to suspend implementation of the demonstration should corrective actions not effectively resolve these concerns in a timely manner.

77) **Close Out Report.**  Within 120 days prior to the expiration of the demonstration, the state must submit a draft Close Out Report to CMS for comments.
   a)   The draft final report must comply with the most current guidance from CMS.
   b)   The state will present to and participate in a discussion with CMS on the Close-Out report.
   c)   The state must take into consideration CMS' comments for incorporation into the final Close Out Report.
   d)   The final Close Out Report is due to CMS no later than thirty (30) days after receipt of CMS' comments.
   e)   A delay in submitting the draft or final version of the Close Out Report may subject the state to penalties described in STC 71.

78) **Monitoring Calls.**  CMS will convene monthly conference calls with the state.
   a)   The purpose of these calls is to discuss ongoing demonstration operation, to include (but not limited to), any significant actual or anticipated developments affecting the demonstration.  Examples include implementation activities, enrollment and access, managed care issues, budget neutrality, and progress on evaluation activities.
   b)   CMS will provide updates on any pending actions, as well as federal policies and issues that may affect any aspect of the demonstration.
   c)   The state and CMS will jointly develop the agenda for the calls.

79) **Post Award Forum.** Pursuant to 42 CFR 431.420(c), within six (6) months of the demonstration's implementation, and annually thereafter, the state shall afford the public with an opportunity to provide meaningful comment on the progress of the demonstration. At least thirty (30) days prior to the date of the planned public forum, the state must publish the date, time and location of the forum in a prominent location on its website. The state must also post the most recent annual monitoring report on its website with the public forum announcement. Pursuant to 42 CFR 431.420(c), the state must include a summary of the comments in the Monitoring Report associated with the quarter in which the forum was held, as well as in its compiled Annual Monitoring Report.

# X. EVALUATION OF THE DEMONSTRATION

80) **Cooperation with Federal Evaluators.** As required under 42 CFR 431.420(f), the state shall cooperate fully and timely with CMS and its contractors' in any federal evaluation of the demonstration or any component of the demonstration. This includes, but is not limited to, commenting on design and other federal evaluation documents and providing data and analytic files to CMS, including entering into a data use agreement that explains how the data and data files will be exchanged, and providing a technical point of contact to support specification of the data and files to be disclosed, as well as relevant data dictionaries and record layouts. The state shall include in its contracts with entities who collect, produce or maintain data and files for the demonstration, that they shall make such data available for the federal evaluation as is required under 42 CFR 431.420(f) to support federal evaluation. The state may claim administrative match for these activities. Failure to comply with this STC may result in a deferral being issued as outlined in STC 71.

81) **Independent Evaluator.** Upon approval of the demonstration, the state must begin arrangements with an independent party to conduct an evaluation of the demonstration to ensure that the necessary data is collected at the level of detail needed to research the approved hypotheses. The independent party must sign an agreement to conduct the demonstration evaluation in an independent manner in accord with the CMS-approved Evaluation Design. When conducting analyses and developing the evaluation reports, every effort should be made to follow the approved methodology. However, the state may request, and CMS may agree to, changes in the methodology in appropriate circumstances.

82) **Draft Evaluation Design.** The state must submit, for CMS comment and approval, a draft Evaluation Design, pertinent to this demonstration extension period no later than one hundred and eighty (180) calendar days after the approval of the demonstration. The state may choose to use the expertise of the independent party in the development of the draft Evaluation Design.

The draft Evaluation Design must be developed in accordance with the following CMS guidance (including but not limited to):
   a) Attachment O (Developing the Evaluation Design) of these STCs, and all applicable technical assistance on applying robust evaluation approaches, including how to establish causal inference and comparison groups in developing a strong Evaluation Design.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 75 of 79

83) **Evaluation Design Approval and Updates.**  The state must submit a revised draft Evaluation Design within sixty (60) calendar days after receipt of CMS' comments.  Upon CMS approval of the draft Evaluation Design, the document will be included as an attachment to these STCs.  Per 42 CFR 431.424(c), the state will publish the approved Evaluation Design within thirty (30) days of CMS approval.  The state must implement the Evaluation Design and submit a description of its evaluation implementation progress in each of the Monitoring Reports.  Once CMS approves the evaluation design, if the state wishes to make changes, the state must submit a revised Evaluation Design to CMS for approval if the changes are substantial in scope; otherwise, in consultation with CMS, the state may include updates to the evaluation design in monitoring reports.

84) **Evaluation Questions and Hypotheses.**  Consistent with Attachments O and P (Developing the Evaluation Design and Preparing the Evaluation Report) of these STCs, the evaluation documents must include a discussion of the evaluation questions and hypotheses that the state intends to test.  The evaluation must outline and address well-crafted hypotheses and research questions for all key demonstration policy components including but not limited to UC, Medicaid managed care, and MLTSS.  The state must evaluate any additional components identified by the state and CMS in the development of the evaluation design.  Furthermore, for programs which will be phasing out during the extension period, the state will appropriately accommodate an evaluation of any such program leveraging—with appropriate modifications—the approved evaluation design from the demonstration approval period preceding this extension period.  The findings from each evaluation component must be integrated to help inform whether the state met the overall demonstration goals, with recommendations for future efforts regarding all components.

The state will be required to investigate cost outcomes for the demonstration as a whole, with evaluation research questions that include but are not limited to: the administrative costs of demonstration implementation and operation, Medicaid health service expenditures, and provider uncompensated care costs.  In addition, the state must use results of hypothesis tests aligned with other demonstration goals and cost analyses together to assess the demonstration's effects on Medicaid program sustainability.

The hypothesis testing should include, where possible, assessment of both process and outcome measures.  Proposed measures should be selected from nationally-recognized sources and national measures sets, where possible.  Measures sets could include CMS's Core Set of Health Care Quality Measures for Children in Medicaid and CHIP (Child Core Set), CMS's Core Set of Health Care Quality Measures for Medicaid-eligible Adults (Adult Core Set), Consumer Assessment of Health Care Providers and Systems (CAHPS), and/or measures endorsed by National Quality Forum (NQF).

85) **Evaluation Budget.**  A budget for the evaluation shall be provided with the draft Evaluation Design.  It will include the total estimated cost, as well as a breakdown of estimated staff, administrative and other costs for all aspects of the evaluation such as any survey and measurement development, quantitative and qualitative data collection and cleaning, analyses and report generation.  A justification of the costs may be required by CMS if the estimates provided do not appear to sufficiently cover the costs of the design or if CMS finds that the design is not sufficiently developed, or if the estimates appear to be excessive.

Complaint Exhibit 1, Page 83 of 86

**86) Interim Evaluation Report(s).**  The state must submit three Interim Evaluation Reports for the approved Evaluation Design for the demonstration years as specified in subparagraph c, and for each subsequent renewal or extension of the demonstration, as outlined in 42 CFR 431.412(c)(2)(vi).  When submitting an application for renewal, the applicable Interim Evaluation Report should be posted to the state's website with the application for public comment.

   a)  The Interim Evaluation Report will discuss evaluation progress and present findings to date as per the approved evaluation design.
   b)  For demonstration authority that expires prior to the overall demonstration's expiration date, the Interim Evaluation Report must include an evaluation of the authority as approved by CMS.
   c)  The state must provide a draft Interim Evaluation Report for the corresponding demonstration years described below, or—for specific demonstration components—for an evaluation period as determined most appropriate by the state and CMS during the development of the draft evaluation design to accommodate potential data lags or other reporting issues.  The state must submit a revised Interim Evaluation Report for each Interim Evaluation Report sixty (60) calendar days after receiving CMS comments on the corresponding draft Report.  The final version of each of the Interim Evaluation Reports must be posted to the state's Medicaid website within 30 calendar days of approval by CMS.

   If the state is seeking to renew or extend the demonstration, the draft Interim Evaluation Report is due when the application for renewal is submitted.  If the state is not requesting demonstration extension, the last draft Interim Evaluation report, as noted in c(iii) below, is due one (1) year prior to the end of the demonstration. For demonstration phase-outs prior to the expiration of the approval period, the draft Interim Evaluation Report listed in (iii) is due to CMS on the date that will be specified in the notice of termination or suspension.

   i.  A Draft Interim Evaluation Report for demonstration years 7-11 will be due no later than March 31, 2024

   ii.  A Draft Interim Evaluation Report for demonstration years 10-14 will be due no later than March 31, 2027

   iii.  A Draft Interim Evaluation Report for demonstration years 10-16 will be due no later than September 30, 2029

   d)  For policies and flexibilities carried forward from the previous demonstration approval period, this first Interim Evaluation report will include the period from October 1, 2017 through September 30, 2022.  For any policy or flexibility not carried forward, the first Interim Evaluation Reprot will include the period from October 1, 2017 through September 30, 2020.  This Interim Evaluation Report replaces the Summative Evaluation Report required per the STCs of the previous demonstration approval period and must include all data and analysis that would have been in that Summative Evaluation Report.
   e)  If the state is seeking to renew or extend the demonstration, the last draft Interim Evaluation Report, representing demonstration years 10-16 is due when the application for renewal is submitted.

Texas Healthcare Transformation and Quality Improvement Program
Demonstration Approval Period: January 15, 2021 through September 30, 2030
Technical Correction: June 26, 2023                                    Page 77 of 79

Complaint Exhibit 1, Page 84 of 86

    f)   The Interim Evaluation Report must comply with attachment P (Preparing the Evaluation Report) of these STCs.

87) **Summative Evaluation Report.**  The draft Summative Evaluation Report must be developed in accordance with Attachment P (Preparing the Evaluation Report) of these STCs.  The state must submit a draft Summative Evaluation Report for the demonstration's current approval period (demonstration years 10 –19) within 18 months of the end of the approval period represented by these STCs (March 30, 2032).  The Summative Evaluation Report must include the information in the approved Evaluation Design.

    a)   Unless otherwise agreed upon in writing by CMS, the state shall submit the final Summative Evaluation Report within 60 days of receiving comments from CMS on the draft.
    b)   The final Summative Evaluation Report must be posted to the state's Medicaid website within 30 days of approval by CMS.

88) **Corrective Action Plan Related to Evaluation.**  If evaluation findings indicate that demonstration features are not likely to assist in promoting the objectives of Medicaid, CMS reserves the right to require the state to submit a corrective action plan to CMS for approval.  These discussions may also occur as part of a renewal process when associated with the state's Interim Evaluation Report.  A state corrective action plan could include a temporary suspension of implementation of demonstration programs, in circumstances where evaluation findings indicate substantial and sustained directional change inconsistent with state targets (such as substantial and sustained trends indicating increased difficulty accessing services, increases in provider uncompensated care costs).  A corrective action plan may be an interim step to withdrawing waivers or expenditure authorities, as outlined in Section III STC 10.  CMS would further have the ability to suspend implementation of the demonstration should corrective actions not effectively resolve these concerns in a timely manner.

89) **State Presentations for CMS.**  CMS reserves the right to request that the state present and participate in a discussion with CMS on the Evaluation Design, the interim evaluation, and/or the summative evaluation.

90) **Public Access.**  The state shall post the final documents (e.g., Monitoring Reports, Close Out Report, approved Evaluation Design, Interim Evaluation Report, and Summative Evaluation Report) on the state's Medicaid website within 30 days of approval by CMS.

91) **Additional Publications and Presentations.**  For a period of twelve (12) months following CMS approval of the final reports, CMS will be notified prior to presentation of these reports or their findings, including in related publications (including, for example, journal articles), by the state, contractor, or any other third party directly connected to the demonstration.  Prior to release of these reports, articles or other publications, CMS will be provided a copy including any associated press materials.  CMS will be given ten (10) business days to review and comment on publications before they are released.  CMS may choose to decline to comment or review some or all of these notifications and reviews.  This requirement does not apply to the release or presentation of these materials to state or local government officials, or if otherwise required by law.

Complaint Exhibit 1, Page 86 of 86